**BANCO NACIONAL DE COSTA RICA, Plaintiff,**

v.

**BREMAR HOLDINGS CORPORATION, Bremar Holdings Ltd., and Corporacion Azucarera Del Sur, S. A., Defendants.**

No. 79–3769.

United States District Court, S. D. New York.

June 25, 1980.

Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C.; Milton Eisenberg, Francis J. O'Toole, Henry A. Hubschman, Stephen M. Foster, Washington, D. C., of counsel; Fried, Frank, Harris, Shriver & Jacobson, New York City; Robert Gerber, David Weisberg, New York City, of counsel, for plaintiff.

Haight, Gardner, Poor & Havens, New York City for defendants Bremar Holdings Corporation and Bremar Holdings Ltd.; Randal R. Craft, Richard L. Jarashow, Saverio Mirarchi, New York City, of counsel.

LASKER, District Judge.

Banco Nacional de Costa Rica ("Banco Nacional") sues to recoup the costs it has sustained and continues to sustain as the guarantor of a series of promissory notes issued by the now defunct defendant Corporacion Azucarera del Sur ("CAS") in connection with a plan to establish a sugar mill in Costa Rica. The complaint contains one claim under section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5; a variety of claims under state law; and a claim for punitive damages.

CAS has not entered an appearance in this action. The other defendants, Bremar Holdings Ltd. ("BHL") and Bremar Holdings Corporation ("BHC"), move for summary judgment on the grounds that 1) the promissory notes involved here are not "securities" within the meaning of section 10(b); 2) Banco Nacional was not a "purchaser" or "seller" of those notes, and so lacks standing to sue under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), in which the Supreme Court endorsed the doctrine of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); and 3) the alleged misrepresentations that form the basis for Banco Nacional's claim under section 10(b) were not the legal cause of Banco Nacional's losses. If they prevail on this branch of their motion, the defendants

seek dismissal of the state law claims for lack of subject matter jurisdiction. Finally, the defendants move for an order under Rule 12(b)(6) dismissing Banco Nacional's claim for punitive damages in the event that the motions for summary judgment and dismissal of the state law claims are denied.

## I.

In early March, 1976, Banco Nacional agreed to guarantee payment of principal and interest on four short-term promissory notes to be issued by CAS to BHL, a merchant banking concern based in London, in return for a loan to CAS to be used to purchase and transport to Costa Rica a sugar mill located in Hawaii. The notes, in the total amount of $1,800,000., were issued on April 14, 1976. They bore interest at 1.9% above the London Inter-Bank Offering Rate, and required payment of a one-time service charge of 1% of their face value in addition to interest.

The notes were originally to mature on September 29, 1976, but the due date was later extended to December 31, 1976, and on December 23, 1976, the notes were cancelled and replaced by ten notes in the total amount of $2,400,000., bearing interest at 1¾% above prime. The new notes were not payable to BHL, but rather to BHC, a wholly-owned United States subsidiary of a wholly-owned Swiss subsidiary of BHL. Like the earlier notes, these were guaranteed by Banco Nacional; each was inscribed with a legend stating:

"Banco Nacional de Costa Rica, San Jose, Costa Rica, as a primary guarantor por aval,[1] hereby fully and unconditionally guarantees the prompt payment of principal and interest on the above Promissory Note when and as due in accordance with the terms thereof and hereby obligates itself as principal debtor.

THE UNDERSIGNED HEREBY WAIVES PRESENTMENT, DEMAND, PROTEST, NOTICE OF PROTEST AND ALL OTHER NOTICES AND DEMANDS OF ANY KIND IN CONNECTION WITH THE DELIVERY, ACCEPTANCE, PERFORMANCE, DEFAULT OR ENFORCEMENT OF THE ABOVE PROMISSORY NOTE AS WELL AS ANY REQUIREMENT THAT THE HOLDER EXHAUST ANY RIGHT OR TAKE ANY ACTION AGAINST THE MAKER OF THE ABOVE PROMISSORY NOTE AND HEREBY CONSENTS TO ANY AND ALL EXTENSIONS OF TIME, RELEASES OF LIENS AND SECURITY, WAIVERS AND INDULGENCES THAT MAY BE MADE OR GRANTED BY THE HOLDER."

One of the ten new notes did or will mature every six months from June 23, 1977 to December 23, 1981. BHC negotiated some or all of the notes soon after receiving them; Banco Nacional has paid each on demand as it came due.

As Banco Nacional understood the underlying deal, based on representations made to it by CAS and representatives of BHL and BHC, the initial short term loan from BHL to CAS was interim or "bridge" financing to be repaid from the proceeds of permanent financing, which CAS represented would soon be in place. The interim loan would enable CAS to proceed with the purchase of the sugar mill in Hawaii, which had already been arranged. Banco Nacional further understood that CAS had arranged to buy the entire mill through arm's length negotiations with the owner, Slofin Holdings Ltd. ("Slofin"), for a price of $3,000,000. C.I.F. Golfito, Costa Rica, and that to meet this price CAS was prepared to put up $1,200,000. in addition to the $1,800,000. to be obtained from BHL. Finally, Banco Nacional understood that BHL and BHC were ordinary commercial banking institutions, and that their role in the transaction was solely that of lender.

1. The term "por aval" is apparently a customary term used in Latin America to denote an unconditional guarantee under which the "avalor" is obliged to pay the debt obligation as if it were the primary debtor, without the need of prior demand on the maker. See Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment and Dismissal at 7 n. **.

In fact, permanent financing was never secured, if indeed it was ever really in the works. The purchase of the sugar mill had not been arranged in advance, Slofin was not the owner, and CAS' negotiations with Slofin could not be termed "arm's length" because Slofin was nothing more than a personal holding company owned by Joseph Slyomovics, one of the principals of CAS. Finally, BHC and BHL came to play a considerably more active role in the deal than a simple lender ordinarily assumes.

Based on its understanding of what was to transpire, Banco Nacional arranged with CAS and BHL to have the proceeds of the $1,800,000. loan from BHL paid to Banco Nacional's correspondent bank in New York to finance a letter of credit payable to Slofin against on-board bills of lading covering the sugar mill to be purchased. Subsequently, BHL sought and received authorization from Banco Nacional to pay the suppliers of the mill directly, and BHL guaranteed to deliver to Banco Nacional bills of lading conforming to the requirements of the letter of credit in favor of Slofin.

Meanwhile, the sugar mill in Hawaii had been sold at auction, much of it to Brill Equipment Co. ("Brill"), which was apparently acting at the behest of Joseph Slyomovics. BHC subsequently purchased from Brill, for $850,000., some of the equipment purchased by Brill at the auction for $482,-975., and some other equipment. BHC arranged to have the equipment dismantled and shipped to Costa Rica, at a total cost, including the purchase from Brill, of $1,431,266.25. This expense, as well as various commissions paid to Brill, Slofin, and Slyomovics, and BHC's own profit on the deal, appear to have been financed in large part thorough the sale of some or all of the ten notes guaranteed by Banco Nacional.

When the sugar mill equipment arrived at Golfito, Costa Rica, CAS did not take delivery, and Banco Nacional, to protect its interest, arranged to have the equipment shipped to the proposed site of the mill in Costa Rica, where it remains today.

\*　　\*　　\*　　\*　　\*　　\*

Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b–5.

Banco Nacional's securities fraud claim is predicated on the assertion that the ten promissory notes issued by CAS to BHC on December 23, 1976 were "securities" within the meaning of Rule 10b–5, that it, as the guarantor "por aval" of those notes was a "seller" within the meaning of the Rule; and that "in connection with" its "sale" of those "securities," CAS, BHL, and BHC misrepresented various material facts, upon which Banco Nacional relied to its detriment. In particular, Banco Nacional contends that the defendants misrepresented that 1) the value and purchase price of the sugar mill were in excess of $3,000,000. when in fact they were substantially less, 2) CAS had arranged to purchase the entire sugar mill in an arm's length transaction, when in fact only a portion of the mill was purchased, and BHC acted as both lender and supplier and profited from self-dealing in connection with the purchase, 3) CAS would apply $1,200,000. of its own money towards the purchase, when in fact the defendants contemplated that the entire purchase would be consummated using funds advanced, in effect, by Banco Nacional, through its guarantees on the promissory notes, 4) CAS intended to repay the interim loan from permanent financing for

the project, which had already been arranged, when in fact no such financing had been arranged, and 5) BHC and BHL were authorized to act as banking institutions under the laws of the State of New York, which in fact they were not.[2]

## II.

The defendants challenge Banco Nacional's assertion that the notes it guaranteed are securities. The applicable definition of a security is contained in section 3(a) the Securities and Exchange Act, which provides that

"unless the context otherwise requires—

.    .    .    .    .

(10) The term 'security' means any note
.    .    . ; but shall not include .    .    . any note .    .    . which has a maturity at the time of issuance of not exceeding nine months .    .    .."

15 U.S.C. § 78c(a). Were it not for the prefatory language "unless the context otherwise requires," the nine of the ten notes involved here that had maturities exceeding nine months would necessarily be securities (and the other, as well as all of the original short term notes, would just as surely not be). However, the courts have long recognized that a literal interpretation of the statutory definition of a security might produce irrational results, and, relying on the prefatory language, have sought to distinguish those objects that Congress intended to encompass within the definition from those which it did not.

In this Circuit, the controlling views are those expressed by Judge Friendly in *Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976). After reviewing the approaches adopted in other circuits, and taking due notice of the limited guidance supplied by the Supreme Court's decisions in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), Judge Friendly concluded that "the best alternative now available may lie in greater recourse to the statutory language," and ruled:

"A party asserting that a note of more than nine months maturity is not within the 1934 Act (or that a note with a maturity of nine months or less is within it) .    .    . has the burden of showing that 'the context otherwise *requires*.' (Emphasis supplied) One can readily think of many cases where it does—the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, § 10(b) of the 1934 Act should generally be held to apply. We realize this approach does not afford complete certainty but it adheres more closely to the language of the statutes and it may be somewhat easier to apply than the weighing and balancing of recent decisions of sister circuits."

544 F.2d at 1137–38 (footnote omitted).

 To prevail on this branch of their motion, then, the defendants must show that the notes involved here bear "a strong family resemblance" to the examples in Judge Friendly's catalogue. The defendants argue, first, that the notes they took from CAS are similar to notes "delivered in consumer financing." However, though the instruments themselves resemble such notes, the determinative factor is not the form of the notes but the substance of the transaction in which they played a part. A loan of $2,400,000. (or even $1,800,000.) used to purchase the principal asset of a new company hardly resembles a loan used to

---

**2.** See Complaint ¶ 23; Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment and Dismissal at 2, 57.

purchase a new family automobile; the debtor here—CAS—hardly resembles the consumer who purchases a new car, or washer, or television. The debt obligations involved here have much more in common with corporate debentures than with a consumer credit agreement.

The defendants next argue that the transaction involved here is analogous to that involved in *Altman v. Knight*, 431 F.Supp. 309 (S.D.N.Y.1977), in which the court held that a promissory note was not within the 1934 Act's definition of a security because it was, in essence, a "purchase money note." In *Altman*, the plaintiff sued derivatively on behalf of the Anaconda Company, which had purchased the Walworth Company for its parent, IU International Corporation, for $25 million cash and a five-year promissory note for approximately $15 million, alleging violations of section 10(b) and Rule 10b–5. The plaintiff claimed that the $15 million promissory note was a "security." The court disagreed, finding

"that defendants have met their burden of showing that notwithstanding the five-year maturity date of the note, it is not a security because 'the context otherwise requires.' "

*Id.* at 312.

The analogy to *Altman* is not convincing. The facts here are radically different, and the resemblance, if any, between the transaction involved there and the one at hand is superficial. In *Altman*, the underlying transaction was the *sale* of a subsidiary of one corporation to another, in which the *vendor* took a promissory note as partial payment of the sale price, though it "would have preferred a cash payment" and took the note as a "cash substitute." *Id.* Here the underlying transaction is a *loan* used to finance the purchase of an essential capital asset of a new corporation, in which the *lender* took promissory notes as consideration for the loan, intending to recover at least some of its expenditure immediately by selling or hypothecating the notes in the secondary market. Indeed, whereas *Altman* involved a single note for $15,000,000., it appears that ten notes were issued here precisely to facilitate their placement in the secondary market by BHC.[3]

These differences in the "context" in which the note in *Altman* was issued and in which the notes here were issued all suggest that the latter *should* be deemed securities. *See SEC v. Garfinkle*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,465 (S.D.N.Y. June 9, 1979). Because the underlying transaction here was a loan rather than a sale, the notes involved here bear no relation to "purchase money notes," and certainly were not a "case substitute," particularly since they were issued against a cash advance.

The Bremar defendants make much of the fact that they did not act here *solely* as lenders, arguing that the reasoning of *Altman* should be applied here because "as lenders/suppliers [they] were acting in a typical mercantile capacity, taking title to the equipment to secure themselves, stepping in as principals to effectuate the transaction and to protect their interests."[4] However, this argument ignores the historical development of the transaction at issue—a development which is the essence of the "context" in which the notes were issued. If the transaction contemplated at the outset had been the sale to CAS of a sugar mill owned by BHC, with payment in the form of promissory notes, the defendants would be in a better position to press their argument, though it is not at all clear even then that it would prevail.

---

3. Indeed, in the hands of those investors to whom BHC sold them, the notes are beyond peradventure "securities"; it would be anomalous to conclude that nonetheless they were not while held by BHC, which took them with the express intention of marketing them. At the very least, the fact that BHC sought the advantages of the market place increases its burden of proving that the notes it marketed are not securities. *See Exchange National Bank, supra*, 544 F.2d at 1137 n. 17.

4. Memorandum of Law in Support of Motion of Defendants Bremar Holdings Corporation and Bremar Holdings Ltd. for Summary Judgment at 31.

But as it happened, BHC's activities took on a "mercantile" cast only, as BHC itself asserts, when it determined to step into the deal because it believed Slofin financially incapable of fulfilling its role. BHC was under no legal obligation to do so, and it is by no means apparent that it needed to do so to protect its interests. Its loan to CAS was fully secured by the original short term notes it held, and its sole duty was to pay the proceeds of the loan to Banco Nacional's correspondent bank in New York, or, later, to assume the role of that bank by paying the supplier of the mill directly against bills of lading. That it chose to intercede even further, and assume the role of supplier itself, because it recognized a potential for profits far exceeding the interest and service fees it was to receive on the loan, does not change the character of the original transaction.

In effect, BHC chose to play two parts as the drama unfolded. But its role as merchant is logically distinct from its original role as lender, and does not confer upon the latter a mercantile character. At the very least, the nature of BHC's participation depends on the precise factual circumstances, and to that extent cannot be resolved until the facts are more fully developed at trial.[5]

On the record to date we conclude that the defendants have not borne their burden of demonstrating that the context in which the notes involved here were issued *requires* that they not be deemed securities. As Judge Friendly concluded in *Exchange National Bank*, "[w]e find nothing in this 'context' that would justify a failure to apply the statutory language and much that demands its application." 544 F.2d at 1139.

### III.

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court

placed its imprimatur on the rule of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), which limits standing to sue for a violation of Rule 10b–5 to "purchasers" or "sellers" of securities. In the second branch of their motion, the defendants contend that Banco Nacional, as guarantor of the notes issued by CAS, is not a "purchaser" or "seller" of securities and consequently lacks standing to bring this action. We reject this contention because we agree with Banco Nacional that it is not within the class of those to whom the Supreme Court intended to deny standing in *Blue Chip*.

The plaintiff in *Blue Chip* had declined to purchase stock offered it under an antitrust consent decree, allegedly because the issuer had presented an overly pessimistic appraisal of its prospects in the hope of discouraging purchases under the decree, so that it could offer the rejected stock to the public at a higher price. In ruling that the plaintiff lacked standing to sue under Rule 10b–5, the Court endorsed the *Birnbaum* rule. The Court noted that three classes of potential plaintiffs are barred by the rule—potential purchasers of shares who choose not to purchase because of "unduly gloomy representations," actual shareholders who choose not to sell their holdings because of "unduly rosy representations," and shareholders, creditors, and others related to an issuer who suffer loss due to insider activities—and recognized that most commentators consider the rule "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b–5." 421 U.S. at 738, 95 S.Ct. at 1926. Acknowledging that the rule deprives some "deserving plaintiffs" of any remedy, the Court concluded that this seemingly harsh and arbitrary result was war-

---

**5.** The defendants note that the transaction at hand could have been structured as a simple loan not evidenced by notes of any kind, and contend that this somehow militates against considering the notes involved here as securities. This argument, however, is unpersuasive, for it is perfectly clear that without the security

provided by notes guaranteed by Banco Nacional, and without the opportunity that such notes provided for immediately recapturing on the secondary markets some of the monies advanced to CAS, no loan to CAS would have been forthcoming.

ranted in the light of the "countervailing advantages of the *Birnbaum* rule, purely as a matter of policy." *Id.* at 739, 95 S.Ct. at 1927.

As articulated by the Court, those advantages derive principally from the fact that the putative plaintiffs denied standing under the *Birnbaum* doctrine are "bystanders to the securities marketing process," *id.* at 747, 95 S.Ct. at 1931, individuals who have not "dealt in the security" in a concrete transaction with quantifiable parameters. In suits by such would-be plaintiffs, there could be no ready and objective measure of damages, and little objective proof of a causal link between the alleged injury and the alleged misrepresentation. In other cases, where the plaintiff has *acted* by purchasing or selling securities, it is not inherently difficult to prove that his action was taken in reliance on the defendant's misrepresentation, and damages can generally be computed on the basis of the quantity and price of the stock bought or sold. But evidence that an individual's *failure* to act was caused by a misrepresentation, and evidence of the form that the act would have taken (e. g. how much stock? at what price?) is necessarily theoretical. Moreover, such evidence will almost always come only from the mouth of the plaintiff, testifying as to matters that can seldom if ever be positively corroborated or disproved.

Thus, in such suits proof of causation and of damages would necessarily be speculative, and the temptation to exaggerate or testify falsely would be greatly heightened. At the same time, simply by paying the filing fee the putative plaintiff would gain access to the arsenal of discovery devices provided by the Federal Rules of Civil Procedure, thereby threatening the defendant with considerable expense in connection with a suit that might well not be justified. Faced with such "vexatious litigation" and the attendant disruption of its affairs, a corporate defendant might be willing to settle claims that have little merit. In the Court's words:

> "The very real risk in permitting those [who have not 'dealt' in a security] to sue

under Rule 10b–5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid attention to it, or that the representations contained in it damaged him. The virtue of the *Birnbaum* rule, simply stated, in this situation, is that *it limits the class of plaintiffs to those who have at least dealt in the security* to which the prospectus, representation, or omission relates."

421 U.S. at 746, 95 S.Ct. at 1930 (emphasis supplied). In view of these considerations, the Court concluded that the better course was to cleave to the longstanding *Birnbaum* rule.

The rule, however, is not to be interpreted more broadly than is necessary to give effect to the policy informing it. Thus, in *Mallis v. Federal Deposit Insurance Corp.*, 568 F.2d 824 (2d Cir. 1977) (Timbers, J.), *cert. denied*, 436 U.S. 915, 98 S.Ct. 2259, 56 L.Ed.2d 416 (1978), the Second Circuit rejected the argument that *Blue Chip* counseled against extending standing to sue under Rule 10b–5 to "pledgees" of stock, noting that "[a] pledge which occurs pursuant to a loan contract is just as concrete a transaction as is a normal transfer of title," *id.* at 829 (footnote omitted), one that provides the sort of objective evidence of causation and damages which the plaintiff in *Blue Chip* could not produce.

Here, too, there was a "concrete" transaction sufficient to allay the fears expressed in *Blue Chip*. Banco Nacional, as the guarantor "por aval" of the notes issued by CAS, stands in the shoes of the maker, or issuer, of those notes, who is undeniably a "seller" within the meaning of the statute. *See Ruckle v. Roto American Corp.*, 339 F.2d 24 (2d Cir. 1964); *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). By their terms, Banco Nacional is obliged to pay the notes "as principal debtor," an obligation that places it within the class of "those who have at least dealt in the security" to which

the alleged misrepresentations relate, 421 U.S. at 746, 95 S.Ct. at 1930, and precisely delimits the extent of its reliance and damages.[6] There can be no question that in guaranteeing the notes issued to BHC, Banco Nacional acted in reliance on direct representations made to it by the defendants, that the injury it suffered is concrete and tangible and the damages it incurred capable of precise computation. The trepidations expressed by the Court in *Blue Chip* have no foundation in circumstances such as these. The *Birnbaum* rule does not bar the court house door to the plaintiff here.[7]

### IV.

■ The movants' next contention— that they are entitled to summary judgment because the undisputed facts show that any misrepresentations they may have made to Banco Nacional could not as a matter of law be the proximate cause of the Bank's injury—requires little discussion. The defendants premise their motion on an unacceptably narrow reading of the complaint, contending that the only misrepresentations attributed there to BHC or BHL are relatively inconsequential ones. However, we agree with Banco Nacional, that fairly read the complaint charges that BHL and BHC participated or knowingly acquiesced in, and Banco Nacional relied on, misrepresentations,

"throughout the period December 1975— December, 1976, that the proceeds of the loan would be used by CAS to purchase from Slofin a Hawaiian sugar mill for a purchase price of $3,000,000, CIF, Costa Rica, that CAS would contribute $1,200,-000 of its funds toward the purchase price and that the loan was being made by a New York bank, BHL, as well as on the belief that the purchase by CAS from Slofin was an arms-length transaction between two independent parties, and that Bremar was acting as a lender and realizing only the fees and interest disclosed to [Banco Nacional]." [8]

These misrepresentations, it is alleged, took the form of both affirmative false or misleading statements and material omissions. It is axiomatic that to prevail, Banco Nacional must prove that these misrepresentations caused its injury. This it can do by showing either that it actually relied on affirmative misstatements, or that a reasonable investor would have been likely to rely on undisclosed information that the defendants were bound to divulge to Banco Nacional either because they enjoyed a special fiduciary relationship with the bank, or because the information was "necessary in order to make the statements made [by the defendants to the bank], in the light of the circumstances under which they were made, not misleading." *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Schlick v. Penn Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir. 1974). Once the alleged misrepresentations are properly characterized, it is obvious that

---

6. We express no view, of course, as to whether an institution or individual that provided a more limited, contingent guarantee than the "guarantee por aval" involved here would have standing to sue under Rule 10b–5 in similar circumstances.

7. At oral argument, defendants' counsel stressed that the federal securities laws exist for the protection of investors, and argued that Banco Nacional is not an "investor" and is not entitled to the protection of those laws. Leaving aside the question whether Banco Nacional can properly be characterized as an "investor" or not it is certainly true that investors are the ultimate intended beneficiaries of the securities laws. Nonetheless, the class of plaintiffs who may sue under the various securities acts is not so narrowly confined, and this case presents an apt illustration of why it should not be. The unnoticed "investors" involved here are those who purchased the notes issued by CAS from BHC. These investors have no cause to sue, since their investment is fully protected by Banco Nacional's guarantee on the notes. But to the same extent that Banco Nacional provides protection to investors, it is surely entitled to the benefit of the legal protection that would otherwise be accorded to them.

8. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment and Dismissal at 57. See Complaint ¶ 23.

the question whether those misrepresentations were the legal cause of Banco Nacional's injury is fraught with genuine issues of material fact precluding summary judgment.

## V.

Since Banco Nacional's securities act claim survives the defendants' motion for summary judgment, pendant jurisdiction exists over the state law claims in the complaint. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Accordingly, it is not necessary to consider Banco Nacional's argument that because it is a wholly-owned instrumentality of Costa Rica, diversity jurisdiction over those claims exists under section 3 of the Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, 90 Stat. 2891, codified at 28 U.S.C. § 1332(a)(4), despite the fact that the plaintiff and two of the defendants are aliens, a circumstance that at least prior to the Act would have destroyed the complete diversity required under *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). *See ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975); 1 J. Moore, Federal Practice ¶ 75[1.–2] at 709.6–.7 (1972).

## VI.

The sole remaining question is whether the moving defendants are entitled to an order pursuant to Rule 12(b)(6) dismissing Banco Nacional's claim for punitive damages, which it seeks in connection with its state law fraud and breach of contract claims.

The defendants argue that under New York Law the plaintiffs cannot recover punitive damages because the fraudulent conduct alleged in the complaint is not "aimed at the public generally." They rely principally on *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961), and on several subsequent Second Circuit decisions which also relied on *Walker: Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1080–81, *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769 (1977); *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1314 (2d Cir. 1977); and *Koufakis v. Carvel*, 425 F.2d 892, 906–08 (2d Cir. 1970).

In *Walker*, the New York Court of Appeals stated:

"Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.

. . .

Although they have been refused in the 'ordinary' fraud and deceit case, we are persuaded that, on the basis of analogy, reason and principle, there may be a recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability. And this court has—in line with what appears to be the weight of authority—sanctioned an award of such damages in a fraud and deceit case where the defendant's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations."

10 N.Y.2d at 405, 223 N.Y.S.2d at 491, 179 N.E.2d at 498–499 (citations omitted).

Even assuming that *Walker* supports the proposition that punitive damages may be awarded under New York Law *only* if the plaintiff alleges and proves gross fraud on the public (the decision does refer to fraud "aimed at the public generally," but it also refers to instances in which punitive damages have been awarded in the absence of "public fraud," and nowhere indicates any disapproval of the practice), that is not conclusive. The New York Court of Appeals has recently addressed the issue again, and has made it clear that proof of "gross, wanton, or willful fraud or other morally culpable conduct" *not* directed at the public generally will support an award of punitive damages. In *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976) (mem.), the Court of Appeals pronounced that

374

"[i]t is not essential, as the Appellate Division stated, that punitive damages be allowed in a fraud case only where the acts had been aimed at the public generally."

Although this statement is *dictum*, it seems unlikely that the Court of Appeals would have gone out of its way to correct a lower court in a brief memorandum opinion unless it intended unequivocally to demark the scope of *Walker*, which the court expressly cited, and perhaps to correct misinterpretations of that decision.

Opinions of lower New York courts support this view. In *Chase Manhattan Bank, N. A. v. Perla*, 65 App.Div.2d 207, 211, 411 N.Y.S.2d 66, 69 (4th Dept. 1978), the court noted that

> [g]enerally, exemplary or punitive damages are recoverable in fraud actions, depending upon defendant's degree of moral culpability (see *Borkowski v. Borkowski*, . . . and cf. *Walker v. Sheldon*, . . . ). Since punitive damages are intended to punish the wrongdoer and deter others so inclined, their availability is measured by the severity of defendant's conduct and they may be awarded when the proof establishes that his conduct is gross, wanton or willful (see *Borkowski v. Borkowski*, . . . ).

And in *Greenspan v. Commercial Insurance Co.*, 57 App.Div.2d 387, 389, 395 N.Y.S.2d 519, 520–21 (3d Dept. 1977), a case involving "willful, malicious and fraudulent breach of contract," the court, relying on *Borkowski*, rejected the defendant's argument, based on *Walker*, that to support a claim for punitive damages "the pleadings must allege not only culpable conduct but a gross and wanton fraud upon the public. This view of the law," the court continued, "is no longer valid," and it held that "[a] cause of action for punitive damages in the absence of 'public fraud' does exist . . . .."

We conclude that today, a plaintiff suing for fraud or breach of contract under New York law can recover punitive damages even though the fraud involved was not "aimed at the public generally." Whether Banco Nacional can prove that the defendants engaged in the sort of morally culpable conduct that would warrant an award of punitive damages of course remains to be seen, but it is entitled to present its proof on the issue.

\*   \*   \*   \*   \*   \*

In sum, we conclude that the long term promissory notes involved in this case are "securities" as that term is used in section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5, that Banco Nacional does have standing to sue for a violation of Rule 10b–5 under the *Birnbaum* rule, that substantial questions of material fact exist as to whether the misrepresentations attributed to the moving defendants in the complaint were the legal cause of the plaintiff's injury, that subject matter jurisdiction exists over the federal and state claims enumerated in the complaint, and that the complaint states a claim for punitive damages under New York law. Accordingly, the motion for summary judgment and to dismiss is denied.

It is so ordered.