The ANSCHUTZ CORPORATION, Plaintiff,

v.

KAY CORPORATION, Defendant.

80 Civ. 479 (MEL).

United States District Court, S. D. New York.

Jan. 28, 1981.

Webster & Sheffield, New York City, for plaintiff; Roger L. Waldman, and Arthur H. Ruegger, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; Robert M. Osgood, and Bruce E. Clark, New York City, of counsel.

LASKER, District Judge.

Kay Corporation moves (1) to dismiss the complaint for failure to state a claim on which relief may be granted, (2) to strike the claim under section 17(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77q(a), and related language, and (3) to strike the claim for punitive damages. The motions are denied.

## I.

On March 29, 1977, Anschutz Corporation purchased from Kay a 50% interest in Metal Traders, Inc. ("MTI"). MTI trades in metal ores and concentrates, and operates a Bolivian antimony mine. Anschutz alleges that during the negotiations leading up to the sale, Kay's representatives intentionally and knowingly or recklessly made materially false and misleading statements and omitted facts necessary to make those statements not false or misleading.

Specifically, Anschutz complains of two sets of alleged misrepresentations. First, Anschutz claims that Kay's president "stated that reserves [of the Bolivian mine] were difficult to ascertain but that a 'major discovery was made in late 1975', and that 'within 3 years this may result in an increase from 80 tons per month to 240 tons per month', an increase that would make MTI the '3rd largest' antimony producer in the world." (Amended Complaint, ¶ 13). Anschutz further alleges that Kay's president was reported as stating that "management placed a two million dollar value on the mine" (Amended Complaint ¶ 13). Anschutz claims that these statements were false and misleading in that, *inter alia*, Kay's management did not in fact value the mine at $2 million, and indeed had actively but unsuccessfully sought from its accountants an upward evaluation of the mine, that the 1975 discovery was merely an exploitation of an old area already exhausted of its lumpy ore deposits and which was not expected to increase the rate of production at all, let alone to 240 tons per month, that "there was doubt" as to the rate of continued production of lumpy ore, and that the only "certain future production" was concentrates which are less profitable than lumpy ore (Amended Complaint ¶ 14).

The second incident of alleged misrepresentations occurred on March 6, 1977 when Kay's representatives told Anschutz that MTI had just declared a $2 million cash dividend (Amended Complaint ¶ 17). Anschutz alleges that Kay did not disclose that to declare the dividend, Kay had to use a substantial portion of its unsecured line of credit, making it unlikely that MTI could continue at its then current volume of trading and that MTI's banks "looked with disfavor upon the dividend." (Amended Complaint ¶ 18).

Anschutz alleges in its first cause of action that these actions violated section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and section 10b–5 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) and Rule 10b–5. In its second cause of action, Anschutz alleges that the same facts constitute common law fraud.

## II.

Kay moves to dismiss both causes of action on the grounds that, as a matter of law, the alleged misrepresentations may not be relied upon and are immaterial under the circumstances alleged in the complaint.

Kay contends that the statement as to the value of the mine was an expression by a seller of its opinion as to the value of the object being sold. Kay argues that Anschutz could not have reasonably relied upon that statement which was allegedly made during arm's length bargaining five months before the closing date, and which was followed by an invitation to return for further details, if any were needed.

Kay relies primarily on *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853 (2d Cir.), (L. Hand, J.) *cert. denied*, 247 U.S. 507, 38 S.Ct. 427, 62 L.Ed. 1241 (1918). Vulcan had purchased a vacuum cleaner manufacturing business from Simmons. Vulcan claimed that Simmons' representatives made false representations regarding the quality and capability of the vacuum cleaner manufactured by it. The court affirmed the grant-

ing of a directed verdict for Simmons on this claim. Vulcan had had the opportunity to examine and test the machines and "ha[d] no right to treat as material in his determination statements like these." *Id.* at 857.

> "The reason of the rule lies, we think, in this: There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth. It is quite true that they induce a compliant temper in the buyer, but it is by a much more subtle process than through the acceptance of his claims for his wares."

*Id.* at 856.

Anschutz argues that the knowing statement of an opinion not actually held is actionable under the securities laws. However, this contention does not address the issue of justifiable reliance which was the basis of the *Vulcan* opinion. Indeed, the *Vulcan* court recognized that the statement of a false opinion is actionable. *Id.*

Nevertheless, the validity of the *Vulcan* rule as applied to the present context is subject to serious question. First, we strongly doubt whether Judge Hand would have adopted the same approach today in view of the heightened standards of disclosure established by the federal securities laws enacted fifteen and sixteen years after the *Vulcan* decision. Second, the statements in *Vulcan*—which concerned the capabilities, efficiency and ease of use of the vacuum cleaners and were deemed seller's "puffing"—are distinguishable from the more objective statement here as to the value of the mine (although in *dicta*, the court stated that the same rule applied to statements of value as well). Indeed, we see no reason why a "sensible man" would

not "tak[e] seriously" a statement of the value of an asset given by its seller.

Even assuming the continued validity of *Vulcan*, and its applicability here, it does not appear from the facts alleged that Anschutz could not have justifiably relied on the statement of Kay's management's assessment of the mine's value. The *Vulcan* court noted that there are cases in which the buyer may reasonably rely on the seller's opinion:

> "When the parties are so situated that the buyer may reasonably rely upon the expression of the seller's opinion, it is no excuse to give a false one."

*Id.* Here, the complaint alleges that as a condition to the negotiations, Anschutz was not permitted to speak to MTI's management. This fact, if proven at trial, together with any other evidence on this point, may establish that Anschutz did not have an "ample chance to investigate," *id.* at 857, and if so would distinguish the case from *Vulcan.* Moreover, such evidence would support Anschutz's claim that it was justified in relying on Kay's assessment of the mine. Accordingly, the motion to dismiss that portion of the first and second causes of action concerning the first set of alleged misrepresentations is denied.

■ As to the second set of alleged misrepresentations (concerning the declaration of a dividend), Kay argues that since Anschutz was given MTI's financial statements, Anschutz could have determined whether the dividend was paid out of credit, and that Anschutz could have restructured MTI's cash and debt structure after taking control.

Anschutz responds that it acquired only 50%—and not control—of MTI, and that even if it could have determined that MTI paid the dividend out of credit, there was no way to know that the banks looked with disfavor on the dividend and that MTI could not continue its then current level of trading activity.

Anschutz does not deny that it had access to MTI's financial statements. However, while this fact may prove at trial to be a successful defense to the claim concerning the declaration of a dividend, it does not

provide a grounds for dismissing the claim at this time. To support its position on this point, Kay relies solely on the assertions in its brief that Anschutz had the information from which it could have concluded the facts alleged to have been omitted. However, Kay has not submitted the financial statements which are claimed to contain that information. Therefore, there is insufficient evidence in the present record on which to judge whether, as Kay claims, the alleged omissions were not "meaningful."

Moreover, we agree with Anschutz that Kay's contention concerning access to the financial statements overlooks the two other alleged omissions, i. e. that Kay did not disclose that the banks looked unfavorably on the dividend, and that the dividend rendered impossible the continuation of trading at the current level.

Accordingly, the motion to dismiss the complaint on the grounds that the alleged misrepresentations may not be relied upon and were not meaningful is denied.

### III.

Kay moves to strike the claim alleged under section 17(a) and related language. Kay argues that there is no private cause of action under section 17(a), and that if there were a private cause of action under section 17(a) it is for fraud and not for mere negligence. Accordingly, Kay argues, the allegation that the falsity of the statements sued upon "should have been known" by Kay (Amended Complaint ¶¶ 15, 19) should be stricken.

Anschutz responds that the law of this circuit is that there is a private right of action under section 17(a) for negligence.

Our assessment of the state of the law in this circuit falls between those of the parties. It is clear from *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir. 1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), and *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1038 (2d Cir. 1980), that the Court of Appeals has held that there is a private right of action under section 17(a). However, the parameters of that right of action have yet to be delineated. The cases have not yet resolved whether, to prevail under section 17(a), a private party must prove scienter or whether proof of negligence suffices.[1]

The need to resolve this issue may be obviated at trial. If Anschutz prevails on its section 10(b) and Rule 10b–5 or common law fraud claims, it will receive full recovery without relying on section 17(a). Consequently, it is appropriate to reserve decision on this issue until after trial. *See Wigand, supra*, 609 F.2d at 1038 ("we note that there is little reason to remand to [the district judge] for the purpose of asking him to determine whether the case should be reopened on the scienter issues, since the plaintiffs' recovery under section 17(a) would in all likelihood not differ from the recovery we have ordered here").

Accordingly, the motion to strike the claim under section 17(a) of the 1933 Act and related language is denied without prejudice.[2]

### IV.

Kay moves to strike the claim for punitive damages asserted under the second

---

1. The court in *Wigand* stated:

   "[W]e conclude that [the claim under section 17(a)] presents an issue that we need not reach.

   "The one circuit that has reached the question has held that private actions under section 17(a) require proof of scienter .... *Sanders*, however, took no position on whether the scienter required could be shown by negligent behavior. The plaintiffs below made allegations which only under the most liberal interpretation can be said to include allegations of scienter, and there was no attempt at trial to prove this element of the

   cause of action. In light of the undesirability of resolving the difficult issues referred to above in a case in which they were unbriefed, we ... affir[m the] judgment of liability on section 12(2) grounds alone."
   609 F.2d at 1038 (citations omitted).

2. Kay asserts in its brief that Anschutz should be required to state its claims under section 17(a) and 10(b) in separate causes of action. This does not appear to be necessary either to the clarity of the complaint or the orderly procedure at trial.

cause of action (for common law fraud). Kay argues that Anschutz has not alleged facts sufficient to support that claim under New York law, which provides for punitive damages only in limited circumstances, that is, when there has been a showing of grossly immoral, wilful or reckless conduct.

However, Anschutz alleges that Kay "acted wantonly, wilfully and maliciously or with recklessness equivalent thereto." (Amended Complaint ¶ 27). These allegations are sufficient to withstand a motion to dismiss. As we noted in another case,

> "Whether [Anschutz] can prove that [Kay] engaged in the sort of morally culpable conduct that would warrant an award of punitive damages of course remains to be seen, but it is entitled to present its proof on the issue."

*Banco Nacional de Costa Rica v. Bremer Holdings Corporation*, 492 F.Supp. 364, 374 (S.D.N.Y.1980).

Accordingly, the motion to strike the claim for punitive damages is denied.

It is so ordered.