**UNITED DEPARTMENT STORES, INC., Wallace R. Plapinger, Allan R. Plapinger, Gerald P. Nathanson and Mervyn Platt**

v.

**ERNST & WHINNEY.**

**Civ. A. No. 83–0614 L.**

United States District Court, D. Rhode Island.

May 15, 1989.

John H. Newman, Porzio, Bromberg & Newman, Morristown, N.J., for individual plaintiffs.

Bruce D. Scherling, Trustee, Scherling, Davidson & Rech, P.C., New York City, for United Dept. Stores.

Julius Michaelson, Providence, R.I., for plaintiffs.

Michael DeFanti, Hinckley, Allen, Snyder & Comen, Providence, R.I., for Ernst & Whinney.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is presently before the Court on defendant Ernst & Whinney's ("E & W") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs initiated a Rule 10b–5, 17 CFR § 240.10(b–5), securities fraud action against E & W, a public accounting firm, after plaintiffs suffered financial loss as a result of their leveraged purchase of a number of department stores and related holdings from the Outlet Company ("Outlet") in 1980. E & W represented both the buyer and seller in this transaction. E & W now moves for summary judgment on the ground that plaintiffs were not "purchasers or sellers" of securities under Rule 10b–5 and thus lack standing to sue.

## BACKGROUND

The original plaintiffs in this action consisted of United Department Stores, Inc. ("UDS") and its four shareholders; Wallace R. Plapinger, Allan R. Plapinger, Gerald P. Nathanson, and Mervyn Platt ("the individual plaintiffs"). In 1980, the individual plaintiffs each held a 25% stake in UDS and comprised the directors and principal officers of that corporation. At that time UDS and its subsidiaries had a net worth of over four million dollars. UDS is now bankrupt and has failed to respond to defendant's motion for summary judgment.

In early 1980 Outlet, a corporation engaged in both the broadcasting and retail department store businesses, was seeking to sell certain of its retail operations (the "Sale Entities"). E & W, a nationally known accounting firm, had long rendered advice to Outlet through its Providence, Rhode Island office. In July of 1980 the individual plaintiffs began to consider acquiring the Sale Entities. They retained E & W (the Buffalo, New York office) to assist them in evaluating and structuring the proposed acquisition.

Initially, the individual plaintiffs sought to buy the Sale Entities through a leveraged purchase using a new corporation to be formed with only nominal assets. The plan was that this new "shell" corporation would purchase the Sale Entities using the Sale Entities themselves as collateral to obtain the necessary financing. However, upon the advice of E & W that more collateral was needed, the individual plaintiffs subsequently determined that, in order to obtain the required financing, it would be necessary to have UDS become the purchaser and thereby place its assets at risk.

In the summer of 1980, the individual plaintiffs and UDS carried on extensive negotiations with Outlet concerning the Sale Entities. These discussions involved both Outlet's investment bank and E & W. Allegedly in reliance on the advice of E & W, the individual plaintiffs resolved that, in order to obtain the necessary bank financing to consummate the deal, they had to commit portions of their personal assets to the purchase. The individual plaintiffs par-

ticipated in several ways. First, each of the four individuals loaned UDS $500,000 and subordinated payment of such loans to the payment of bank indebtedness incurred by UDS in buying the Sale Entities. Second, three of the individual plaintiffs subordinated payment to themselves of $2,750,000 of existing UDS notes to bank indebtedness incurred by UDS in the Outlet transaction. Finally, Wallace R. Plapinger committed to personally guarantee a $5,000,000 note (the "Wally Note") issued by UDS to Outlet as part of the purchase price of the Sale Entities.

UDS and Outlet executed a purchase and sale agreement for the Sale Entities on September 30, 1980. The base purchase price totalled 38.5 million dollars, 28.5 million dollars of which consisted of cash and 10 million dollars of which consisted of two 5 million dollar notes—one of which was the Wally Note. However, the purchase price was subject to adjustment based on the financial statements of the Sale Entities as of October 25, 1980, which was the effective date of the closing. The individual plaintiffs allege that, unbeknownst to them, the Sale Entities were in such failing condition that their market value as a going concern at the time of the transaction was zero.

Plaintiffs maintain that E & W advised them that it would have no conflict of interest in performing services for both Outlet and UDS. In fact, E & W allegedly told the individual plaintiffs that, due to its familiarity with the sale entities, dual representation would be beneficial. The purchase price was set based on the Sale Entities' financial statements of January 31, 1980 and October 25, 1980. E & W reported on these statements to UDS and the individual plaintiffs and it was in reliance on E & W's recommendations that plaintiffs decided to purchase the Sale Entities.

The individual plaintiffs contend that E & W made erroneous financial projections concerning the Sale Entities, furnished erroneous financial and accounting information describing the operations of the Sale Entities, and falsely claimed that E & W would exercise due care in advising and educating plaintiffs regarding the Outlet transaction. In short, the individual plaintiffs claim that E & W made untrue statements of material facts and failed to state material facts and that such conduct was intended to, and did in fact, defraud the plaintiffs. As a result, plaintiffs claim, UDS purchased the troubled Sale Entities and became bankrupt; thus causing the individual plaintiffs to lose money they had directly contributed to the purchase as well as their total investment in UDS.

The instant action is not the first adversarial proceeding to arise out of the Outlet transaction. First, UDS and Outlet engaged in a lengthy formal arbitration proceeding that resulted in litigation in a New York state court. Further, UDS, Outlet and Bruce Sundlun, Outlet's president, were parties to two other federal suits filed in this district. Finally, Outlet brought suit in the United States District Court for the Southern District of Florida against Wallace Plapinger to recover on his guaranty of the Wally Note. All these actions have been resolved leaving only the present litigation.

Plaintiffs filed the initial complaint in this action on September 29, 1983, and a First Amended Joint Complaint, which contains two counts and is presently the operative complaint, on October 17, 1983. In Count I plaintiffs allege that E & W made false statements and omitted material facts, and also aided Outlet in making false statements and omitting material facts so as to defraud plaintiffs. Such conduct by E & W, plaintiffs allege, is a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and the rules and regulations of the Securities and Exchange Commission thereunder. At oral argument counsel for the individual plaintiffs stated that this was a Rule 10b–5 action.

Count II is a claim brought by Wallace Plapinger alone arising out of his obligation on the five million dollar Wally Note. He maintains that this note is a security that was purchased through the Outlet transaction and that he guaranteed the note in reliance on the wrongful activi-

ty of E & W. Therefore, Wallace Plapinger contends that E & W has violated Section 10(b) of the Securities Exchange Act of 1934, the rules and regulations promulgated thereunder, and particularly Rule 10b–5.

In their First Amended Joint Complaint plaintiffs pray for the following damages. Wallace Plapinger, Allan Plapinger and Mervyn Platt demand $2,416,666 each in compensatory damages and $2,500,000 each in punitive damages under Count I. Individual plaintiff Gerald Nathanson demands $1,500,000 in compensatory damages and $2,500,000 in punitive damages under Count I. Finally, Wallace Plapinger in Count II demands whatever amount he is obligated to pay on the Wally Note. At the time the First Amended Joint Complaint was filed the Wally Note was the subject of the above-mentioned (then pending) federal court action in the Southern District of Florida.

After 1983, plaintiffs' suit against E & W languished in a suspended animation of extensions, counsel changes, and other delays—perhaps aggravated by the bankrupt condition of UDS. Apparently, plaintiffs were content to let this action drift along until their other actions were resolved. After having filed a previous motion for summary judgment which it eventually withdrew, E & W filed the instant motion for summary judgment on July 18, 1988. The case was assigned to this writer in September, 1988.

In its motion for summary judgment, E & W argues that it is entitled to judgment because plaintiffs' suit is barred by the doctrine of collateral estoppel due to the New York arbitration proceeding and related litigation. Through a supplemental memorandum of December 23, 1988, E & W also claims that the individual plaintiffs were not "purchasers" or "sellers" of securities under the *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), rule and thus lack standing to bring a Rule 10b–5 action. The *Birnbaum* rule was adopted by the United States Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). UDS failed to respond to E & W's motion, but, the individual plaintiffs objected and filed memoranda.

The parties engaged in oral argument on February 3, 1989. During this hearing, the parties greatly refined the issues remaining in this case. The Court made it clear from the bench that E & W's collateral estoppel ground for judgment was baseless since the parties and the issues in this action are obviously different from those in the prior litigation. In response to E & W's contention that they lack standing, the individual plaintiffs argued that *Blue Chip* is not applicable to the present case since plaintiffs are not suing as shareholders for the diminished value of their UDS stock, but are suing for distinct monies that they advanced in order to consummate the Outlet transaction. Specifically, the individual plaintiffs' claim for damages is now limited to the two million dollars contributed by the plaintiffs—$500,000 from each of the four individuals—and the loss on the five million dollar Wally Note. E & W noted that the Florida litigation over the Wally Note has been settled for an as yet undisclosed sum.

The only issue now remaining before the Court is whether the individual plaintiffs have standing under Rule 10b–5 to maintain an action against E & W for their specific damages of two million dollars and losses on the Wally Note stemming from the Outlet transaction. At the conclusion of oral argument this Court took the matter under advisement. It is now in order for decision.

## DISCUSSION

The legal positions of the parties are fairly clear. E & W claims that the individual plaintiffs lack standing to bring this Rule 10b–5 action because they were neither purchasers nor sellers of securities. E & W relies on *Blue Chip Stamps v. Manor Drug Stores.* Plaintiffs argue that *Blue Chip* does not bar their suit because their action is not one of the three types explicitly rejected by the Supreme Court in *Blue*

*Chip,* and the dangers sought to be avoided by the *Blue Chip* rule are not present here. The individual plaintiffs maintain that they are not seeking recovery for the diminution in value of their UDS stock, but rather are suing for the actual, concrete sums that they invested in the Outlet transaction that were lost. E & W responds that *Blue Chip* creates a bright line rule which does not allow for exceptions.

The seminal case in the area of standing under § 10(b) of the Securities Exchange Act of 1934 and under Rule 10b–5 is *Birnbaum v. Newport Steel Corp.,* supra. In that 1952 decision, the Court of Appeals for the Second Circuit held that only purchasers or sellers of securities have standing to bring private damages actions under § 10(b) and Rule 10b–5. *Birnbaum,* 193 F.2d at 463–64. The United States Supreme Court adopted the *Birnbaum* rule in its 1974 decision in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. at 731, 95 S.Ct. at 1923.

In broad terms, the facts in *Blue Chip* are as follows. The defendant, *Blue Chip,* was compelled to make a stock offering pursuant to a civil antitrust consent decree. *Id.* at 725–26, 95 S.Ct. at 1920. Blue Chip made the offering but allegedly defrauded the offerees by painting an overly gloomy picture of the corporation's health. Therefore, the Blue Chip plaintiff claimed that it had not bought stock and had thereby suffered injury. *Id.* at 727, 95 S.Ct. at 1921. The Supreme Court held that since the plaintiff was neither a purchaser nor a seller of securities, it lacked standing to bring a Rule 10b–5 action. *Id.* at 731, 95 S.Ct. at 1923.

The *Blue Chip* Court held that the *Birnbaum* rule denies standing to three principal classes of potential plaintiffs.

First are potential purchasers of shares ... who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was. Second are actual shareholders in the issuer who allege that they decided not to sell their

shares because of an unduly rosy representation or a failure to disclose unfavorable material. Third are shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5.

*Id.* at 737–38, 95 S.Ct. at 1926. The plaintiffs in the instant case do not fit into any of these three categories.

In *Blue Chip,* the Supreme Court went on to detail the dangers that are avoided by the *Birnbaum* rule. First, the purchaser/seller limitation avoids "conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis." *Id.* at 735, 95 S.Ct. at 1925. Second, the *Birnbaum* doctrine avoids some vexatious litigation. Rule 10b–5 litigation "presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general" because a danger of "strike" suits is very prevalent in securities transactions and may delay or frustrate normal business activity. *Id.* at 739–40, 95 S.Ct. at 1927. Third, the *Birnbaum* rule lessens "the possibility that unduly expansive imposition of civil liability 'will lead to large judgments, payable in the last analysis by innocent investors, for the benefit of speculators and their lawyers.'" *Id.* at 739, 95 S.Ct. at 1927. Fourth, limiting Rule 10b–5 standing decreases the "potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure." *Id.* at 741, 95 S.Ct. at 1928. Fifth:

Without the *Birnbaum* rule, an action under Rule 10b–5 will turn largely on which oral version of a series of occurrences the jury may decide to credit, and therefore no matter how improbable the allegations of the plaintiff, the case will be virtually impossible to dispose of prior to trial other than by settlement....

The *Birnbaum* rule, on the other hand, permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question. The fact of purchase of stock

and the fact of sale of stock are generally matters which are verifiable by documentation, and do not depend upon oral recollection....

*Id.* at 742, 95 S.Ct. at 1928. Finally, the Court in *Blue Chip* discussed other problems of proof that are avoided through the purchaser/seller limitation. *Id.* at 747, 95 S.Ct. at 1931.

None of the dangers cited by the Supreme Court are present in the instant case. The four individual plaintiffs here each seek to recover their $500,000 loan contributions to the Outlet transaction, and Wally Plapinger further desires to recover money lost because of his guaranty of the Wally Note. There is nothing speculative or conjectural about these sums. The case does not present an inordinate danger of vexatiousness or abuse of discovery. Recovery would not transfer money from "innocent investors" to "speculators and their lawyers". And, finally, plaintiffs' suit is not based solely on oral recollection, but is supported by concrete documentation as to the overall Outlet transaction and the individual contributions of the plaintiffs. Therefore, neither the specific holding of *Blue Chip*, nor its underlying rationale militate in favor of denying standing in this case.

Regardless of the specifics of the instant dispute, E & W argues that *Blue Chip* establishes a bright line rule which denies the individual plaintiffs standing to sue. The Supreme Court's *Blue Chip* decision contains the following passage upon which E & W relies.

> Were we to agree with the Court of Appeals in this case, we would leave the *Birnbaum* rule open to endless case-by-case erosion depending on whether a particular group of plaintiffs was thought by the court in which the issue was being litigated to be sufficiently more discrete than the world of potential purchasers at large to justify an exception. We do not believe that such a shifting and highly fact-oriented disposition of the issue of who may bring a damages claim for violation of Rule 10b–5 is a satisfactory basis for a rule of liability imposed on the conduct of business transactions. Nor is it as consistent as a straightforward application of the *Birnbaum* rule with the other factors which support the retention of that rule.

*Id.* at 755, 95 S.Ct. at 1934. The Court of Appeals' proposition in the above passage, with which the Supreme Court refused to agree, was that an offeree who did not purchase a security still had standing to maintain a Rule 10b–5 action. Such an issue is not presented by the present case.

That caveat notwithstanding, E & W has a strong argument that *Blue Chip* establishes a bright line purchaser/seller rule. However, a finding of standing in this case will not open a pandora's box of speculative and vexatious litigation. The present case involves clear-cut, concrete proof of loss to the individual plaintiffs through their personal contributions to the Outlet transaction. The individual plaintiffs here, in a sense, were purchasers to the extent of their personal loans. Such loss is not conjectural, but is clearly demonstrated by documentation and is easily quantifiable. Therefore, the slippery-slope problems expressed in the above passage are not present in this case. As an aside, it should be noted that this Court is not piercing UDS's corporate veil, but is simply granting standing to the extent of the individual plaintiffs' *direct* investment in the Outlet purchase.

Several recent cases have held that one who is not a purchaser or seller of securities has standing to bring a Rule 10b–5 action where the dangers discussed in *Blue Chip* are not present. *Grubb v. Federal Deposit Insurance Corp.*, 868 F.2d 1151 (10th Cir.1989); *Norris v. Wirtz*, 719 F.2d 256, 259 (7th Cir.1983) (Plaintiff, the beneficiary of a trust, had standing to bring a Rule 10b–5 action arising from a security transaction of the trust. "The plaintiff is not a bystander as contemplated in *Blue Chip Stamps* and to grant standing under these circumstances seemingly does not threaten the concerns expressed in *Birnbaum*."), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984); *Banco Nacional De Costa Rica v. Bremar Holdings*, 492 F.Supp. 364, 370–72 (S.D.N.Y.

1980) ("Here, too, there was a 'concrete' transaction sufficient to allay the fears expressed in *Blue Chip*.... The trepidations expressed in *Blue Chip* have no foundation in circumstances such as these."). *Contra, Crabtree Investments v. Aztec Enterprises,* 483 F.Supp. 211, 214–16 (M.D.La.1980); *Reid v. Madison,* 438 F.Supp. 332, 334 n. 1 (E.D.Va.1977).

An analysis of *Grubb* is instructive in deciding the standing issue presently before this Court. In *Grubb,* defendant bank ("First National") sold another bank ("Security State") to Weatherford Holding. First National later became insolvent and the FDIC became its receiver. Initially, First National offered Security State to Grubb, a private individual. Thereafter, Grubb and another individual formed a separate holding company, Weatherford Holding, to purchase Security State. In conjunction with the transaction, Grubb borrowed $625,000 to raise his 50% share in Weatherford Holding and personally guaranteed half of its loan to purchase Security State.

When Security State's business turned out to be less than had been represented, Grubb sued First National. The Court of Appeals for the Tenth Circuit ruled that Grubb had standing to bring a Rule 10b–5 action against the defendant, and specifically that the *Birnbaum* rule did not bar Grubb's suit. The Court held:

> The policy concerns that prompted the *Blue Chip* Court to adopt the *Birnbaum* rule do not apply in this case. Grubb was not a mere bystander to the sale of Security State stock. First National made the alleged representations directly to Grubb before Weatherford Holding even existed, thus inducing him to involve himself in the transaction by borrowing $625,000 to establish the holding company and personally guarantying repayment of one-half of its loan to purchase the Security State stock. As a result of the note and the unconditional guaranty, Grubb was the actual party at risk in the transaction. In effect, Grubb himself bought half of the Security State stock....

. . . . .

Finally, *Blue Chip* concerns do not arise in that Grubb seeks damages not for a decrease in the value of his Weatherford Holding stock, but for the *direct* injury he suffered as a result of the note and guaranty he executed in reliance on First National's representations....

868 F.2d at 1161–62.

Clearly, the rationale of *Grubb* is applicable in the instant case. As in *Grubb,* the individual plaintiffs here are not suing for the diminution in value of their UDS stock, but for the direct injury they suffered as a result of their $500,000 contributions and the Wally Note allegedly made in reliance on E & W's advice and representations. The individual plaintiffs certainly were not mere bystanders, but instead were the actual parties at risk in the Outlet transaction to the extent of their direct investment of two million dollars and guaranty of the Wally Note. Therefore, the individual plaintiffs have standing to maintain their Rule 10b–5 action.

Since the Court has concluded that plaintiffs have standing, there is no need to decide whether or not the Wally Note transaction constitutes the sale of a security for Rule 10b–5 purposes.

## CONCLUSION

The individual plaintiffs have standing to maintain their 10b–5 action against E & W for the losses they incurred as a result of their direct investment in the Outlet transaction. Therefore, E & W's motion for summary judgment is denied. While UDS has failed to respond to E & W's motion, this Court cannot say as a matter of law that E & W is entitled to summary judgment and therefore cannot grant defendant's motion as to UDS. *Jaroma v. Massey,* 873 F.2d 17 (1st Cir.1989). However, since UDS has displayed no interest in pursuing its claim, the Court will hold a show cause hearing to determine if it should be dismissed from this litigation.

*It is so Ordered.*