**Steven M. RAYMAN, Plaintiff,**

v.

**PEOPLES SAVINGS CORPORATION, et al., Defendants.**

No. 89 C 4144.

United States District Court, N.D. Illinois, E.D.

April 10, 1990.

Theodore R. Tetzlaff, Kenneth A. Kroot, Benjamin L. Sells and Renata M. Sos, Jenner & Block, Chicago, Ill., for plaintiff (counter-defendant) Steven M. Rayman.

William T. Dwyer, Jr., Leonard S. Shifflett, Alexander Terras, Keith J. Shuttleworth, Gerard D. Ring, Burke, Wilson & McIlvaine, Chicago, Ill., for defendant

  (counter-plaintiff) James M. and Bridget M. Flanagan.

Michael B. Brohman and Samuel J. Betar, III, Kamensky & Rubinstein, Lincolnwood, Ill., for counter-defendant Thomas J. Mulcahy.

Thomas L. Browne and Ellen Zopff Todia, Chicago, Ill., for third-party defendants John D. Purdy, Jr. and Siemon, Larsen & Purdy.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action arises out of the sale by plaintiff Steven Rayman ("Rayman") of all the shares of stock (the "Shares") of Crest Savings ("Crest") to defendant Peoples Savings Corporation ("PSC"), immediately followed by PSC's transfer of the Shares to its wholly-owned subsidiary (and present codefendant) Peoples Bank for Savings ("PBS"). Two other codefendants, James Flanagan and his wife Bridget,[1] have moved for leave[2] (1) to file a counterclaim against Rayman, (2) to join as an added defendant to that counterclaim former Crest President Thomas Mulcahy ("Mulcahy") and (3) to file a third-party complaint against Flanagans' former attorney John D. Purdy, Jr. ("Purdy") and Purdy's law firm Siemon, Larsen & Purdy (the "Partnership").[3] For the reasons stated in this memorandum opinion and order:

1. Because it seems that only James Flanagan took part in negotiating the transaction at issue, this opinion will refer to him as "Flanagan." Where both James and Bridget are meant, "Flanagans" will be used.

2. Initially Flanagans simply filed the currently-challenged counterclaim and third-party complaint without requesting leave to do so. Flanagans' attempt to add several parties through that pleading would have expanded the scope of the lawsuit more than the Federal Rules of Civil Procedure ("Rules") allow without prior judicial permission. Accordingly this Court's November 22, 1989 memorandum opinion and order (the "Opinion") struck that attempted filing sua sponte and told Flanagans that if they wished to refile they would have to move for leave to do so and to accompany that motion with a memorandum in support, addressing the issues dealt with in today's opinion.

3. Opinion at 1 characterized Flanagans' attempted filing as a counterclaim against Rayman with

a third-party complaint against Mulcahy, Purdy and the Partnership—as did the introductory (unnumbered) paragraph to Flanagan's Counterclaim and Third Party Complaint. Flanagans' Memorandum in Support (F.Mem. 2 n. 1) then said:

> The Flanagans' Counterclaim and Third Party Complaint filed with the Court on November 9, 1989 designated Mulcahy a third party defendant. Under the joinder provisions discussed below, Mulcahy is more appropriately designated a counterdefendant.

While normally the Counterclaim and Third Party Complaint—the operative document—would govern this Court's characterization of Flanagans' filing, neither characterization is strictly accurate. True enough, Mulcahy is a "third party" to Rayman's original lawsuit, but he does not fit the class of third-party defendants contemplated by Rule 14 (see n. 18). At the same time, the term "counterdefendant" would seem appropriately reserved for parties

1. Flanagans' motion for leave to file is granted only as to Counterclaim Count II, alleging common law fraud against Rayman and Mulcahy. Joinder of Mulcahy as an additional defendant in that count is also granted.

2. Leave to file Counterclaim Counts I and III against Rayman and Mulcahy is denied.

3. Leave to file the third-party complaint contained in Count IV is also denied.

### Background

In March and April 1988 Rayman and PBS entered into an agreement (the "Agreement") that provided in substance for the former's sale and the latter's purchase of the Shares for $9 million in cash. Purdy conducted the deal negotiations on behalf of PSC, PBS, John B. Schnure ("Schnure," president of both PSC and PBS and a principal shareholder in PSC)[4] and Flanagan (another principal shareholder in PSC).[5] As required by law where control of a savings association is being acquired by any savings and loan holding company (12 U.S.C. § 1730a(e)(1)(A)(i)[6]), the Agreement specifically conditioned the closing of the purchase on approval by Federal Savings and Loan Insurance Corporation ("FSLIC") as well as any other required governmental approval (it appears that though the application for approval was directed to FSLIC, formal approval had to emanate from Federal Home Loan Bank Board ("Board")). By June 14 Board had conditionally approved the transaction and change of control as described in the purchaser's application.

Unfortunately, things looked to be going south when PSC found itself unable to arrange the financing that the parties had agreed to and had described to the regulatory authorities. That unexpected hurdle was cleared as far as the parties were concerned when they agreed to (and memorialized in their September 8 "Closing Agreement") a restructuring of the transaction so that:

1. PSC rather than PBS would be the purchaser of the Shares.

2. Rayman would receive $5.5 million in cash and PSC's note for $3.5 million (the "PSC Note") instead of the previously-agreed $9 million in cash.[7]

3. Each of Flanagans and Schnures would execute an unconditional personal guaranty of the PSC Note.

Although those changes in the transaction necessitated further Board approval, that approval was apparently never secured. PSC then defaulted on the PSC Note, and the parties are now pointing the fingers of asserted blame (and liability).

Rayman's finger points at Schnure, Flanagan, and PSC–PBS.[8] According to Rayman's Amended Complaint, PSC's default resulted from its failure to procure Board approval of the modified transaction. Rayman further alleges that defendants personally and through their counsel (Purdy)

---

plaintiff in the original suit who later become defendants in the counterclaim. Instead, here a natural reading of the counterclaim and third-party complaint's substantive allegations against Mulcahy as an aider and abetter in Rayman's alleged fraud would indicate that Mulcahy should be joined, if at all, as an additional defendant to Flanagans' counterclaim against Rayman (accord, *Baltimore & Ohio Railroad Co. v. Central Railway Services*, 636 F.Supp. 782 (E.D.Pa.1986)).

4. Schnure and his wife Victoria (collectively "Schnures"), as guarantors along with Flanagans, are also named as codefendants to Rayman's lawsuit.

5. Whether and to what extent either Schnure or Flanagan was personally involved in negotiating the agreement is not revealed by the pleadings.

6. Since the events described in this opinion, the governmental regulatory structure for the savings and loan industry has been revised. This opinion of course speaks in terms of the then-existing requirements.

7. PBS additionally was to deliver to Rayman a $525,000 note (the "PBS Note") in return for Rayman's covenant not to compete.

8. Rayman's current focus has necessarily shifted primarily to collecting on the Schnure and Flanagan guaranties, because after Rayman's suit was initially filed in this Court PSC filed for reorganization under Bankruptcy Code Chapter 11, making it impossible to collect from PSC on the $3.5 million note due to the resulting automatic stay (11 U.S.C. § 362).

violated Securities Exchange Act of 1934, § 10(b) (15 U.S.C. § 78j(b)) and SEC Rule 10b–5 (collectively "Section 10(b)") by intentionally misleading Rayman into believing that Purdy, Schnure and Flanagan had engaged in a series of telephone conversations with Board officials, had explained to those officials the changes in the deal's financing and had secured Board's approval—none of which, Rayman claims, ever occurred.

With Flanagans' tendering of the current Counterclaim and Third Party Complaint, the roving finger points back at Rayman and also at present nonparties Mulcahy, Purdy and Partnership. Counterclaim Counts I and II respond in kind to Rayman's Section 10(b) and common law fraud claims. Rather than targeting the failure to obtain Board approval, in those claims Flanagans blame PSC's default on problems endemic to Crest's banking business that Rayman and Mulcahy failed to disclose before the closing. Flanagans specifically say that Rayman and Mulcahy intentionally misstated the financial condition of Crest and overstated the value of the Shares "by as much as 18 times [their] actual value" in violation of Section 10(b) and of common law principles of fraud. Counterclaim Count III then attempts to use the failure to obtain Board approval against Rayman as an offensive weapon, seeking a declaratory judgment that the entire transaction was illegal and therefore the guaranties are unenforceable. Finally, in Count IV Flanagans present a third-party complaint against Purdy and Partnership for legal malpractice, asserting their alleged failure to obtain the necessary Board approval. This Court must decide whether to allow Flanagans to pursue any or all of those claims as part of this action.

### Standing To Assert Counterclaim Count I

■ Rayman and Mulcahy urge this Court to deny Flanagans leave to advance their Count I claim on the ground that Flanagans lack standing to sue under Section 10(b). This Court agrees.

Neither party disputes the well-established rule for determining whether a plaintiff has standing to assert a Section 10(b) claim. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) adopted what had become known as the *Birnbaum* rule after the seminal case of *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.1952): Standing under Section 10(b) is limited to plaintiffs who were purchasers or sellers of securities. Whether Flanagans may maintain their Count I counterclaim thus turns in the first instance on whether they, as significant shareholders in the purchasing company and guarantors of the purchase price, fit into one of those categories.[9]

Flanagans recognize that their status as significant shareholders in the purchasing corporation cannot confer Section 10(b) standing (see *Smith v. Ayres,* 845 F.2d 1360, 1364 & n. 13 (5th Cir.1988)). Instead they rely on their status as guarantors of the purchase price, invoking *Grubb v. FDIC,* 868 F.2d 1151, 1161–62 (10th Cir. 1989). Because that concept really represents their only prospect of success in establishing *Blue Chip* standing, a detailed look at *Grubb* is in order.

*Grubb* involved the sale by First National Bank and Trust Company of Oklahoma City ("First National") to Weatherford Holding ("Weatherford") of all the shares

---

**9.** Actually, the issue turns on whether Flanagans are in the first category (purchasers), because Flanagans do not purport to be sellers of securities. As Opinion at 4 stated, and Flanagans have not contested, the purchase money notes Flanagans guaranteed "would certainly not seem to be securities." Since the Opinion was issued *Reves v. Ernst & Young,* — U.S. —, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) has specifically addressed the question of when demand notes like those at issue here may be securities covered by Section 10(b), and it has adopted the

Second Circuit's "family resemblance" test (see *Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir.1976)). Viewed even under that lens, the notes in this case do not qualify as securities where (1) Rayman's purpose in accepting the notes was not for investment but to finance temporarily a deal that had originally been planned as all cash, (2) the notes are not traded for investment or speculation and (3) the notes are all held by one party.

of the troubled Security State Bank ("Security"). When Security had begun experiencing financial difficulties, its chairman William Schulte ("Schulte") went in search of a partner willing to invest in Security's reorganization. Schulte found Ronald Grubb ("Grubb"). Together they investigated Security's financial condition and negotiated a deal with First National under which (1) Schulte and Grubb would set up Weatherford, a shell corporation, for the sole purpose of purchasing and holding all the Security stock, (2) First National would lend each of Schulte and Grubb $625,000 so each could purchase half the Weatherford stock (with Grubb executing a note in favor of First National to evidence that loan to him), (3) First National would then lend $3.75 million to Weatherford in return for Weatherford's note in that amount secured by the Security stock and unconditional guaranties by Schulte and Grubb, each in the amount of $1.875 million, and (4) Weatherford would inject the $5 million into Security, whose stock First National would transfer to Weatherford. At the end of the day, Weatherford was thus to have purchased the Security stock, having financed 75% of that purchase with notes unconditionally guaranteed by its own shareholders Schulte and Grubb.

When Grubb became dissatisfied with the deal he had made, he sued First National under Section 10(b) for misrepresenting Security's financial picture. Rather than strictly applying the *Blue Chip* purchaser-seller rule to bar Grubb's suit on the ground that the nominal purchaser was Weatherford and not Grubb, the *Grubb* court looked behind the Weatherford entity and held that Grubb was the actual purchaser where:

1. First National had made the alleged misrepresentations during direct negotiations with Grubb.

2. Those negotiations took place before Weatherford even came into existence.

3. Weatherford was a shell corporation created for the sole purpose of facilitating the already-negotiated purchase.

4. Grubb's unconditional guaranty and personal note for $625,000 made him appear the primary obligor.

5. Both the transaction and Grubb's interest were well-documented.

Flanagans seek to emphasize the circumstances of the current case that make it factually similar to *Grubb:* Flanagan's involvement in negotiating the transaction,[10] the guaranty provisions enabling Rayman to collect on the note directly from Flanagans without first proceeding against PSC, and the documentation of the sale and of Flanagans' interest. But Flanagans gloss over the all-important fact: *Grubb* found that it was the other facts already listed (and not present here), as well as those stressed by Flanagans, that warranted a conclusion that the purchasing corporation was a mere conduit for the individual investors. *Grubb,* 868 F.2d at 1162 therefore distinguished an earlier case (*City National Bank of Fort Smith, Ark. v. Vanderboom,* 422 F.2d 221, 228 (8th Cir.1970)) that was much more like the current one—and in which Section 10(b) standing was rejected.

---

**10.** On that score, Flanagans do a poor job in backing up their conclusion of direct involvement with any factual allegations. They do not allege any direct involvement in negotiating the original Agreement at all (Schnure's is the only signature for PSC), or in talks leading up to the date of closing. Although Flanagan did attend the closing and signed agreements there, the Counterclaim and Third Party Complaint says this about Flanagan's involvement at that point:

63. As counsel for Flanagan, Purdy, and Siemon, Larsen & Purdy undertook to obtain the necessary and required approval of the FSLIC and/or FHLBB to conclude the Transaction. Purdy, and Siemon, Larsen & Purdy also undertook to handle all negotiations with counsel for Rayman regarding the necessary documentation to close the Transaction.

64. Flanagan had no contact with the FSLIC and/or FHLBB regarding the necessary and required approval for the Transaction. Flanagan had no contact with Rayman or counsel for Rayman regarding the documentation necessary to close the Transaction. Keeping in mind that Purdy represented PSC, PBS and Schnure as well as Flanagan, that is hardly sufficient involvement even to suggest (let alone to conclude) that Flanagans rather than PSC or PBS were the real parties to the negotiations.

In *Vanderboom* the investors had caused their corporation ("ITC") to purchase all the shares of a savings bank ("AHB") and had allegedly been defrauded in the process. *Vanderboom*, 422 F.2d at 228 rejected the investors' suggestion that the court look behind the corporate purchaser, by analogy to the doctrine of piercing the corporate veil, because "ITC was not a mere conduit formed by these investors to purchase AHB." Also important to that determination was the fact that the investors seeking to pursue a Section 10(b) counterclaim were not all the shareholders of ITC and (*id.*):

> ITC had its own separate corporate structure and only subsequent to its incorporation did Gatlin propose that ITC purchase another financial institution rather than starting one of its own. Under these circumstances we feel the corporate integrity of ITC must be respected and not glibly and casually disregarded.

Rather than the investors' suing individually, the court continued (*id.*):

> The proper course of action for these investors was for them to raise their 10b–5 claim by bringing a derivative suit on behalf of ITC.

In terms of Flanagans' allegations (which this Court must accept as true for current purposes), this case is somewhere between *Vanderboom* (no standing where neither conduit nor unconditional guaranty) and *Grubb* (standing where both conduit and unconditional guaranty). Although Flanagans have not claimed that the PSC–PBS corporate structure was a mere conduit for the Share purchase, Flanagans allege a well-documented "direct" injury as guarantor of the purchase price. Analysis of which side of the watershed this case falls upon requires a look at the Supreme Court's purpose in adopting the *Birnbaum* rule.

Plaintiff in *Blue Chip* was given an opportunity to purchase stock under the terms of a judicial consent decree, but declined to purchase in alleged reliance on defendants' intentionally over-pessimistic statements about the value and risks associated with the stock. *Blue Chip* held such merely potential purchasers did not have standing to pursue Section 10(b) claims because their alleged injury did not occur (in the words of Section 10(b) itself) "in connection with the purchase or sale of any security." Flanagans' principal argument is that the conclusion reached in *Blue Chip* rested on a case-specific analysis of whether a finding of standing would pose a threat of vexatious lawsuits by "bystanders" to the transaction—persons whose injury (if any) would be difficult or impossible to prove, but who could use the prospect of litigation to practice extortion without having exposed themselves to the transaction's risks. Where those concerns are lessened by easily proved injury and a clear assumption of risks by a plaintiff in a well-documented transaction, Flanagans insist *Blue Chip* is not a bar to suit.

Flanagans do plausibly read *Grubb* to adopt that approach—after all, *Grubb* did systematically go through each of the concerns raised in *Blue Chip* and found none was implicated before the court decided to grant standing. On that reading, a determination that standing would not implicate the policy concerns identified in *Blue Chip* would suffice to confer standing on a Section 10(b) plaintiff. But in this Court's view, such a reading is flatly inconsistent with language in *Blue Chip* that teaches the purchaser-seller rule was meant to be an easily applied bright-line rule. This Court's perception is that it may be a necessary, but it is *not* a sufficient, condition of Section 10(b) standing that the concerns voiced in *Blue Chip* would not be implicated by allowing a plaintiff to sue under Section 10(b). In all events the court must find some independent reason to deem the plaintiff a purchaser or seller of a security, as *Grubb* implicitly found when it looked through the corporate purchaser to the underlying shareholder.

*Blue Chip* specifically rejected the entire approach the Court of Appeals had taken in that case (*Manor Drug Stores v. Blue Chip Stamps*, 492 F.2d 136, 142 (9th Cir. 1973)). There the Ninth Circuit had found standing to sue by carving out an exception

to the *Birnbaum* rule in what the Court of Appeals called a "highly unusual situation in which an unyielding insistence upon the existence of a contract to purchase as a prerequisite to relief would subordinate substance to form." Under those circumstances the Supreme Court might have reversed the lower court simply by finding that the potential plaintiffs had an insufficient connection to the transaction to warrant an exception to the purchaser-seller rule. Instead, after listing the reasons not to grant standing to those particular plaintiffs the Supreme Court went further and said (421 U.S. at 755, 95 S.Ct. at 1934):

> Were we to agree with the Court of Appeals in this case, we would leave the *Birnbaum* rule open to endless case-by-case erosion depending on whether a particular group of plaintiffs was thought by the court in which the issue was being litigated to be sufficiently more discrete than the world of potential purchasers at large to justify an exception. We do not believe that such a shifting and highly fact-oriented disposition of the issue of who may bring a damages claim for violation of Rule 10b–5 is a satisfactory basis for a rule of liability imposed on the conduct of business transactions. Nor is it as consistent as a straightforward application of the *Birnbaum* rule with the other factors which support the retention of that rule.

Also highly instructive for current purposes is the effect of *Blue Chip* on our Court of Appeals' earlier decision in *Eason v. GMAC*, 490 F.2d 654 (7th Cir.1973). *Eason* had taken the approach urged by Flanagans here, refusing to apply a bright-line purchaser-seller rule to a case in which a shareholder of a corporate seller of securities had also guaranteed payment on the securities. Instead the court applied a test that other courts (see, e.g., *Crabtree Investments, Inc. v. Aztec Enterprises, Inc.*, 483 F.Supp. 211, 216 (M.D.La.1980)) have characterized as a "nexus" test (490 F.2d at 659):

> The emphasis on the injured party's status as an investor indicates that the protection of the rule extends to persons who, in their capacity as investors, suffer significant injury as a direct consequence of fraud in connection with a securities transaction, even though their participation in the transaction did not involve either the purchase or the sale of a security.

There can be no doubt whatever that *Blue Chip* scotched that approach: Justice Stevens, who had himself authored *Eason* while a judge on our Court of Appeals, said exactly that in his concurring opinion in *Chiarella v. United States*, 445 U.S. 222, 238 n. *, 100 S.Ct. 1108, 1119 n. *, 63 L.Ed.2d 348 (1980):

> The specific holding in *Eason* was rejected in *Blue Chip Stamps*....

This Court holds that the purchaser-seller rule must be viewed as a bright-line standard that does not allow for more forgiving case-by-case determinations. If the Supreme Court had meant to extend standing to every potential plaintiff who could distinguish his or her case from *Blue Chip* on its facts, the Court would not have stressed so prominently the need for a predictable rule, for to allow such case-by-case distinctions would impermissibly reopen the door to the rejected "nexus" approach.[11]

Now to the question whether Flanagans were "purchasers" under the *Birnbaum* rule. To flesh out the meaning of the terms "purchaser" and "seller," *Blue*

---

**11.** This is not to say that there will never be difficult decisions to be made, but rather that the need for such decisions will be far less frequent than they would be if every case could qualify for an exception to the *Birnbaum* rule where the *Blue Chip* concerns were met. In *Grubb*, for example, the court had to determine who had *in fact* purchased the securities—a flesh-and-blood investor or his corporate alter ego. Similarly, in *Norris v. Wirtz*, 719 F.2d 256 (7th Cir.1983) our Court of Appeals had to determine whether shares purchased for a trust were purchased by the trustee with legal title or by the individual possessing beneficial ownership and power to direct the trustee's investment decisions. Flanagans are simply mistaken in labeling *Norris*'s grant of standing to the beneficiary as an indication that "the Seventh Circuit has gone beyond the 'buyer-seller' limitation" (F.R.Mem. 2). It has merely added necessary content to the word "purchaser" within the overall framework of the *Birnbaum* rule.

*Chip,* 421 U.S. at 737–38, 95 S.Ct. at 1926–27 (emphasis added) said:

> Three principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule. First are potential purchasers of shares ... who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was. Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material. Third are *shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment* due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5.

As for the second and third groups, *Blue Chip, id.* (citation omitted) continued:

> [T]hese classes may frequently be able to circumvent the *Birnbaum* limitation through bringing a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities.

That list of potential plaintiffs "presently" barred from bringing suit was clearly not meant to be exhaustive or to remain fixed for all time. Indeed, although the third category refers only to individuals in some way related to the issuer, it is equally well-established that the *Birnbaum* rule bars Section 10(b) suits by shareholders and creditors of purchasers as well. *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) (footnote omitted) explained the rationale for demanding that Section 10(b) suits be brought by the purchasing corporation rather than by injured creditors of the purchaser:

> We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.... And the fact that creditors of the defrauded corporate buyer or seller of securities may be the ultimate victims does not warrant disregard of the corporate entity.[12]

Clearly Flanagans' guaranty does not convert them into purchasers of the Shares for standing purposes. For example, if Flanagans had loaned to PSC the cash with which to purchase the Shares in return for PSC's note, Flanagans would have experienced no less direct an injury from the loss in value of the Shares and PSC's resulting default. But in that instance Flanagans would be mere creditors of PSC, foreclosed from suing under Section 10(b) in their individual capacity. Nor would the result be any different if Flanagans, insufficiently liquid to make the loan themselves, had enlisted a third-party lender to finance the deal and had become coobligors on the loan by executing a personal guaranty in favor of the lender (see *Reid v. Madison,* 438 F.Supp. 332, 334 n. 1 (E.D.Va.1977)). Yet if this Court were to accept Flanagans' extension of the purchaser-seller rule, there would be no principled reason not to extend it to both of those situations. Surely the amounts lost in either case would cause just as "direct" (or indirect) an injury to Flanagans as the losses resulting from Flanagans' guaranty in favor of Rayman.

Even were this Court to accept *Grubb*'s nominee-situation exception to *Blue Chip*'s bright-line teaching,[13] Flanagans must lose.

**12.** [Footnote by this Court] Both this and *Blue Chip*'s references to "creditors" tend to confirm this Court's determination that the mere absence of *Blue Chip* concerns is insufficient to confer standing. If the rule were otherwise, shareholders or creditors of an issuer injured by a drop in the value of their investment would *not* be barred from suit. Both their interest in the issuer and their injury are well-documented and not speculative, as is the risk they take by holding stock in the issuer. Because shareholders may sue derivatively, the *Birnbaum* rule does not prevent strike suits by them nor does it prevent the abuse of discovery. Nevertheless, suits by such individuals are barred because they have no claim to be "purchasers" or "sellers" and any injury they might sustain is the province of state law, not the federal securities laws.

**13.** It should be emphasized that this remains a doubtful premise for the reasons already suggested in the text. But for the reason next discussed, the question need not be resolved.

Nominee status for the ultimate purchaser depends by definition upon the deal having been struck directly by the real parties in interest, who then shoehorned the nominal purchaser into the picture simply to facilitate the already-negotiated deal. Those were the court's findings in *Grubb*. By total contrast, the deal here had always been structured as a cash purchase by PBS—it was only months after the parties had reached agreement and had signed documents to that effect that a breakdown in the financing arrangements first injected Flanagans into the documents between purchaser and seller.[14] At least under those circumstances this Court will not extend the term "purchaser" to encompass guarantors of the purchase price such as Flanagans.

Flanagans cite to two other district courts they say have resolved this issue differently. In *Banco Nacional De Costa Rica v. Bremar Holdings Corp.*, 492 F.Supp. 364 (S.D.N.Y.1980) Corporacion Azucarera del Sur ("CAS") issued a series of notes to Bremar Holdings Ltd. ("BHL") in return for a loan from BHL for the purchase of a sugar mill. Banco Nacional de Costa Rica ("Banco Nacional") unconditionally guaranteed the notes. When the deal went bad Banco Nacional brought suit under Section 10(b), claiming to have executed the guaranty in reliance on misrepresentations by both CAS and BHL (as well as one of BHL's subsidiaries). On those facts the court (*id.* at 371 (citations omitted)) extended standing to Banco Nacional on the ground that "Banco Nacional, as the guarantor 'por aval' of the notes issued by CAS, stands in the shoes of the maker, or issuer, of those notes, who is undeniably a 'seller' within the meaning of the statute."

Rayman and Mulcahy try to distinguish *Banco Nacional* on the ground that Flana-

gans were not the principal debtors under the note. In *Banco Nacional* the notes contained an explicit provision styling Banco Nacional as "primary guarantor por aval," a term of art used in Latin America to indicate that the guarantor is obliged to pay as if he or she were the primary debtor, and Banco Nacional in fact made the payments as the notes came due. Neither of those things was the case here—though it is true that Rayman did not have to pursue or exhaust his remedies against PSC or PBS before proceeding against Flanagans, the fact remains that Flanagans' liability was not triggered until a primary obligor defaulted.

More importantly, as unconditional guarantor of the *securities* at issue in that case, Banco Nacional occupied a position vis-a-vis the securities transaction wholly distinguishable from Flanagans' position as guarantors of the *purchase price*. As this opinion's discussion of *Grubb* demonstrates, Flanagans' involvement in the transaction at issue was secondary. Banco Nacional, in contrast, had nothing to look to in the transaction but the securities or the issuer. But because the value of the securities simply reflected the value of the issuer, once the securities were determined to have been worthless any additional comfort provided by the presence of the issuer turned out to be cold indeed. Thus, insofar as Flanagans' reliance on *Banco Nacional* rests on a claimed parallel between (1) the relation that the guarantor of the purchase price bears to the purchaser and (2) the relation that the guarantor of the securities sold bears to the seller, that reliance is misplaced. Even if *Banco Nacional* properly considered the plaintiff in that case to have dealt in a security (a question this Court obviously need not answer), Flana-

14. Even at that point Flanagan's entry into the transaction took the form of secondary liability to that of the original intended purchaser: If the purchaser remained current on its obligations Flanagans would never have become liable on the guaranty. Hence the risk assumed by Flanagans by guaranteeing the PSC note is identical to the risk that would have been assumed by a bank lending money to PSC for the purchase of the Shares. In addition to looking to the value

of the Shares, such a lender would undoubtedly rely just as much in evaluating the risk on PSC's financial condition. Where PSC is itself a vital going concern, Flanagans' guaranty makes Flanagans look more like creditors of PSC than a purchaser in PSC's "shoes." As such, Flanagans' individual claims are against PSC under the state law of corporate management, or against Rayman only derivatively on behalf of PSC.

gans by contrast are more accurately seen as mere creditors of PSC.[15]

*United Department Stores, Inc. v. Ernst & Whinney*, 713 F.Supp. 518 (D.R.I. 1989) is the only case Flanagans cite that clearly adopts a reading of *Blue Chip* inconsistent with this Court's, and insofar as it does this Court remains unpersuaded. *United Department Stores, id.* at 523 reads *Grubb, Norris* and *Banco Nacional* to hold:

> [O]ne who is not a purchaser or seller of securities has standing to bring a Rule 10b–5 action where the dangers discussed in *Blue Chip* are not present.

Simply put, this Court believes that to be a misreading of those cases—one that this Court will not follow.

As it happens, had *United Department Stores* focused on whether the plaintiff in that case was in fact a purchaser, it might have come to the same conclusion that standing was appropriate. Just as in *Grubb*, the plaintiff in *United Department Stores* (for simplicity's sake this discussion will pretend there was a single purchaser-plaintiff, even though actually there were four) initially entered into direct negotiations to purchase the shares of a going concern using a shell corporation. Only later, when it became apparent that the selling entities would not themselves provide sufficient collateral to make the deal go, did plaintiff restructure the transaction to make one of his operating businesses the nominal purchaser. At the same time, plaintiff hedged his company all around with notes drawn on plaintiff personally and with a personal guaranty of the only note issued by the purchasing corporation.

Even if this Court were willing on those facts to look behind the formality of the nominal purchaser to find its shareholder the true purchasing entity,[16] it has already been explained that such was not the current case. Here the corporate purchaser was there for more than show, and by Flanagan's own assertion the personal guaranties were an after-the-deal development as the result of changed circumstances.

### Counterclaim Count III: Declaratory Judgment

■ Counterclaim Count III seeks a declaratory judgment under 28 U.S.C. § 2201 declaring the sale of Crest shares void for failure to obtain FSLIC's prior written approval of the transaction as required by statute. According to Flanagans that failure vitiates the entire transaction, including any of Flanagans' obligations as guarantors.

Rayman opposes the filing of that claim because it is duplicative of Flanagans' Second Affirmative Defense (F.Answer ¶¶ 25–26), which asserts the illegality of the non-FSLIC-approved transaction. Rayman notes that illegality is among the matters that must be pleaded as affirmative defenses under Fed.R.Civ.P. ("Rule") 8(c) and that Counterclaim Count III raises the same facts and legal issues as the Second Affirmative Defense. Rayman Mem. 7 concludes:

> By misdesignating this affirmative defense as a Counterclaim and pleading it again, Flanagans have accomplished nothing more than complicating the pleadings.

Rayman looks to *Green Bay Packaging, Inc. v. Hoganson & Associates, Inc.*, 362 F.Supp. 78 (N.D.Ill.1973) and *Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir.1985) for support. Those authorities do indeed provide persuasive authority for Rayman's position.

In *Green Bay Packaging* plaintiff sought a judgment declaring it was not liable to defendant for certain commissions on sales of plaintiff's products. Defendant counterclaimed for, among other things, a declaratory judgment on the identical issue

---

**15.** All the matters in the text serve to distinguish *Banco Nacional* from this case. But even if they did not suffice for that purpose, just as with the case next discussed in the text this Court will not follow that holding to break (or bend) *Blue Chip* to the extent Flanagans require here.

**16.** Once again it is unnecessary to resolve that assumption, which must at best be seen as highly dubious in *Blue Chip* terms.

but to the opposite effect. Then District Judge William Bauer (now Chief Judge of our Court of Appeals) granted plaintiff's motion to strike those portions of the counterclaim because (362 F.Supp. at 82) they "merely restate an issue already before this Court" and "[i]t is well settled that such repetitious and unnecessary pleadings should be stricken." And a dozen years later *Tenneco,* 776 F.2d at 1379 (citations omitted) cited *Green Bay Packaging* with approval when it said in a somewhat different context: [17]

The label "counterclaim" has no magic. What is really an

answer or defense to a suit does not become an independent piece of litigation because of its label.... When the original complaint puts in play all of the factual and legal theories, it makes no difference whether another party calls its pleadings counterclaims, affirmative defenses, or anything else. The original complaint brought the dispute into court, and the parties to that complaint are parties to each aspect of the imbroglio.

Rayman argues that just as the court in *Green Bay Packaging* refused to allow defendant to pursue a counterclaim that essentially duplicated (albeit from the defendant's perspective) the complaint's prayer for declaratory relief, this Court should deny Flanagans leave to assert a counterclaim that merely duplicates Flanagan's Second Affirmative Defense. This Court agrees, notwithstanding Flanagans' attempt to draw attention away from that case.

First, Flanagans attempt to distinguish *Green Bay Packaging* on its facts by arguing that Counterclaim Count III is not wholly redundant (as was the counterclaim

in *Green Bay Packaging* ) because Counterclaim Count III raises a federal statute not implicated on the face of the Amended Complaint, whereas the counterclaim in *Green Bay Packaging* sought relief identical to that sought in the complaint. But the logic of *Green Bay Packaging* is no less compelling where, as here, the counterclaim simply duplicates arguments made by way of affirmative defense.

Next Flanagans challenge the holding of *Green Bay Packaging* itself as "an aberration in the law" (D.R.Mem. 9), citing *Iron Mountain Security Storage Corp. v. American Specialty Foods, Inc.,* 457 F.Supp. 1158, 1161 & n. 3 (E.D.Pa.1978). *Iron Mountain* denied plaintiff's motion to dismiss defendant's counterclaim even though plaintiff argued the counterclaim was nothing more than a "mirror image" of plaintiff's claim. Along the way the court, *id.* (citations omitted) said of *Green Bay Packaging:*

That case did dismiss counts of a counterclaim because they "merely restate[d] an issue already before [the] Court" (362 F.Supp. at 82), but I have found no other case which has followed that holding or is in accord with its reasoning. Most of the cases cited in support of the holding in *Green Bay Packaging* do not deal with counterclaims and none of them held that a counterclaim could be dismissed merely because it duplicated issues in the complaint.

Whether or not *Iron Mountain* is distinguishable in factual terms from the present case (as a brief analysis would disclose it is), the quoted passage does reflect a fundamental disagreement with *Green Bay Packaging.* But since then *Tenneco* has recognized and confirmed the good sense

---

**17.** *Tenneco* dismissed for want of jurisdiction the appeal of an order in which this Court had denied an interested party's motion for leave to intervene in a suit that was pending on this Court's calendar. In that case the movant ("FICC") was one of several defendants in a multi-party commercial lawsuit in which one of FICC's codefendants ("Erlanger") had counterclaimed for amounts due it from plaintiff ("Tenneco"). When Erlanger sought summary judgment on its counterclaim, FICC feared being left out in the cold and moved to intervene in the

counterclaim to protect its own interest. After this Court denied FICC's motion and expressed its intention to dispose of the summary judgment motion without FICC's participation, FICC appealed. Our Court of Appeals held that denial was not appealable because FICC was already a party to all facets of the case and therefore the rejection of its motion to "intervene" was more properly viewed as an interlocutory order governing the timing of disposition of the myriad issues raised in the case.

of *Green Bay Packaging*. This Court will do the same and follow what must be viewed as the established law in this Circuit.

Indeed, the propriety of an order striking Counterclaim Count III is directly confirmed by Rule 8(c):

When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

Regardless of the label attached to it by Flanagans, Counterclaim Count III—seeking no affirmative relief as against Rayman other than an adjudication that the sale of Crest shares was illegal—is really an affirmative defense to the enforcement of Flanagans' guaranties. It adds nothing to the pleadings Flanagans have already put before this Court. This Court will therefore simply disregard that duplicative count, just as it would if Flanagans had responded to the Complaint with two identical affirmative defenses pleading illegality rather than with one illegality defense and a separate counterclaim reasserting illegality.

### Counterclaim Count II: Common Law Fraud

■ That leaves the unchallenged Flanagans' Count II, which alleges common law fraud by Rayman (and by Mulcahy—more on him later) and suffers from none of the difficulties of Counts I and III. Moreover, although there appears to be no independent ground for federal jurisdiction over Count II—it involves no federal claim and there is no diversity among the parties— Count II meets the requirements of Rule 13(a) for compulsory counterclaims:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Both Rayman's claims and Flanagans' counterclaims arise out of the sale of the Shares, and Flanagans' counterclaims may be adjudicated without the presence of any third parties outside of this Court's personal jurisdiction. Because "a compulsory counterclaim requires no independent federal jurisdictional basis" (*By–Prod Corp. v. Armen–Berry Co.*, 668 F.2d 956, 960 (7th Cir.1982)), Counterclaim Count II is within this Court's jurisdiction.

### Joinder of Mulcahy

■ Flanagans also seek to join Mulcahy in the Counterclaim Count II fraud claims pursuant to Rule 13(h), stating that Mulcahy (F.Mem. 9) "play[ed] a significant role in conducting the fraud" and "aid[ed] and abett[ed] Rayman in committing the fraud." Rule 13(h) says:

Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.

Rule 19(a) deals with the required joinder of new parties:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

And Rule 20(a) provides for the permissive joinder of parties as defendants:

if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if

any question of law or fact common to all defendants will arise in the action.

*B & O*, 636 F.Supp. at 787 allowed the joinder as an additional defendant in the counterclaim [18] of a third party alleged to have "caused, aided, or abetted the plaintiffs' commission of many of the acts described in the counterclaim." Because of that "extensive involvement" in the acts alleged in the counterclaim, the court held joinder proper under Rule 19(a). Mulcahy strenuously resists parallel treatment on the grounds (echoing that Rule's standards) that Flanagans have not alleged (1) that their counterclaim could not be satisfied fully by an action solely against Rayman, (2) that Mulcahy claims an interest in anything that is the subject of the action and that would be put at risk by a failure to join Mulcahy or (3) that failure to allow joinder would threaten Rayman with double, multiple or otherwise inconsistent obligations.

It is unnecessary to decide whether Mulcahy meets the required-joinder conditions of Rule 19, because he clearly qualifies for permissive joinder under Rule 20. Any liability against Rayman and Mulcahy would be joint and several, arising out of the sale of the Shares. In addition, while the issues bearing on the liability of those two may not track precisely, this case undoubtedly meets the test that "any question of law or fact common to all defendants will arise in the action." That conclusion is supported not only by the alternative holding to the same effect in *B & O*, *id.* at 787, but also by 6 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1436, at 274–76 (2d ed. 1990) (footnotes omitted):

It generally has been held that persons brought into an action under Rule 13(h) as parties to either a compulsory coun-

terclaim under Rule 13(a) or a cross-claim under Rule 13(g) will come under the ancillary subject matter jurisdiction of the court. This result is based largely on the fact that both compulsory counterclaims and cross-claims involve the same transaction or occurrence as the original action and therefore are closely related to the main claim. Thus, a party can be added for purposes of adjudicating those claims without regard to his citizenship or to whether the party is joined pursuant to Rule 19 or Rule 20, since his presence will not be deemed to destroy the court's existing jurisdiction.

In the interest of judicial economy, this Court will exercise its ancillary jurisdiction over Counterclaim Count II against Mulcahy.

### Third–Party Complaint Against Purdy and Partnership

■ Finally, Flanagans attempt to bring Purdy and the Partnership into this lawsuit by tendering a third-party complaint for their alleged malpractice in connection with Purdy's efforts to obtain Board approval for the sale of Shares. On that score they follow their allegations quoted in n. 10 with these assertions:

66. While at Purdy's offices on September 8, 1988, Purdy advised Flanagan that he had obtained the necessary and required approval of the FSLIC and/or FHLBB to close the Transaction.

67. In reliance upon Purdy's representations, on September 8, 1988, Flanagan executed the documents necessary to close the Transaction. The documents include but are not limited to: (i) the Closing Agreement; (ii) the Continuing Unconditional Guaranty; and (iii) the guaranty of the PBS Note.

**18.** Counterplaintiff in *B & O*, 636 F.Supp. at 783 actually styled the additional defendant as a third-party defendant, as did Flanagans in the instant action. Under Rule 14 a third-party complaint may be brought only against an individual "who is or may be liable to him for all or part of the plaintiff's claim against [the defendant/third-party plaintiff]." Like Flanagans, however, the plaintiff in that case never alleged that the third-party defendant would be liable

for part or all of any award on the original complaint, but rather that the putative third-party defendant was jointly responsible for the misdeeds alleged in the *counterclaim.* *B & O, id.* at 786–87 held that not to suffice, but instead viewed the counterplaintiff as having attempted to join the third party as an additional defendant in the counterclaim. This Court does the same.

While Flanagans (consistently with their claims against Rayman and Mulcahy) do not blame the transaction's demise on the failure to obtain Board approval, they claim to have been injured themselves as a result of that failure:

69. Had Purdy, or Siemon, Larsen & Purdy informed Flanagan that the necessary and required approval had not been obtained prior to closing the Transaction, the Transaction would not have closed and Flanagan would not have been named as a defendant in the complaint filed by Rayman.

70. Flanagan's expenses in defending against the Complaint filed by Rayman, and bringing this Counterclaim and Third Party Complaint, are the proximate result of Purdy and Siemon, Larsen & Purdy's failure to obtain the necessary and required approval. Flanagan has suffered additional losses through the loss of his investment in PSC. Flanagan has additional potential liability to the Federal government through a net worth maintenance agreement signed in favor of PSC.

WHEREFORE, Flanagan prays for entry of judgment in his favor and against Purdy and Siemon, Larsen & Purdy:

A. Awarding Flanagan compensatory damages for the losses he has suffered; and

B. Awarding Flanagan his costs, including reasonable attorneys' fees, and such additional relief as this Court may deem just and proper.

Because legal malpractice is a matter of Illinois substantive law, this Court may entertain Flanagan's Count IV claims only pursuant to its ancillary jurisdiction. As this Court has said numerous times (see, e.g., *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Continental Illinois Corp.*, 661 F.Supp. 964, 967 (N.D.Ill.1987)), an affirmative decision as to the existence and exercise of such ancillary jurisdiction requires a determination that the third-party claim (1) arises from the same "nucleus of operative fact" (*United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)) as the principal

claim and (2) "depends at least in part upon the resolution of the primary lawsuit" (*Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 376, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1978)).

Flanagans rely on this Court's decision in *May's Family Centers, Inc. v. Goodman's, Inc.*, 104 F.R.D. 112 (N.D.Ill.1985) exercising ancillary jurisdiction over a third-party complaint for legal malpractice. There a lessee had sued its lessor for unreasonable refusal to consent to lessee's assignment of its rights and obligations under the lease. Lessor in turn claimed to have instructed its attorney to exercise all lessor's responsibilities under the lease and therefore insisted that the attorney was to blame if lessor did breach its lease agreement by failing to consent. Lessor consequently filed a third-party complaint against the attorney for the negligent failure to make sure lessor's obligations under the lease were carried out.

This Court, *id.* at 115 spelled out two ways in which such a third-party claim could meet the *Owen Equipment* requirement of dependency on the principal lawsuit. To translate those in terms of the current case, either:

1. Purdy's or Partnership's liability to Flanagan must depend on a finding of Flanagan's liability to Rayman, or

2. Purdy's or Partnership's *non* liability to Flanagan must be established by a finding of Flanagan's *non* liability to Rayman.

Flanagan's proposed third-party complaint meets neither test.

As to the first, a decision imposing liability on Flanagans on Rayman's claim would not necessarily lead to liability by Purdy or the Partnership. That result would flow only from a further finding that Purdy or the Partnership acted negligently in breach of their duty to represent Flanagans diligently in the negotiations with Rayman, FSLIC and the Board (see *May's*, 104 F.R.D. at 115).

As to the second, Flanagans' F.Mem. 14 says:

Here, if the evidence establishes that the necessary federal agency approval was

obtained prior to closing the Transaction, Flanagan would not be liable to Rayman on his securities fraud claim, and consequently Purdy and the Partnership would not be liable to Flanagan for any securities claim damages. Accordingly, the second leg of the ancillary jurisdiction test is satisfied.

That argument won the day in *May's* because the plaintiff there sought simply to pass to its attorneys the baton of liability for the failure to consent to the lease assignment. Here, however, the exoneration of Flanagans on Rayman's claims would not necessarily foreclose the attorneys' liability on the third-party complaint. As the already-quoted prayer for relief shows, Flanagan seeks damages for the costs of defending Rayman's suit—costs incurred whether or not Rayman's suit is successful. Hence the outcome of Flanagan's proposed third-party complaint is not just a function of the outcome of the primary lawsuit in the second sense either.[19]

That being true, this Court has no jurisdiction over Count IV regardless of the extent to which the factual issues it raises may overlap with those raised by Rayman's primary claim. Leave to file Count IV must be and is denied.[20]

### Conclusion

Flanagans' motion for leave to file is denied as to Counts I, III and IV of the

counterclaim and third-party complaint. Leave to file Count II is granted, as is Flanagans' motion to join Mulcahy as an additional defendant in that counterclaim. Rayman and Mulcahy have until April 25, 1990 to reply to the counterclaim and the next status date is set for 9 a.m. May 1, 1990.

---

**19.** In addition, that lack of necessary dependency would undoubtedly sink Flanagan's attempt to call upon Rule 14(a) for authority to implead Purdy and Partnership. Under that rule:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him.

Where as here the liability of a potential third-party defendant is not dependent upon the liability of the putative third-party plaintiff, that liability is not "for all or part of the plaintiff's claim against him."

**20.** This decision as to the absence of ancillary jurisdiction also obviates the need to address the argument advanced by Purdy and Partnership in Purdy Mem. 4–5 that this Court should deny the third-party complaint on the ground that under Illinois law a fraudfeasor is barred from using the judicial system to help consummate a fraud. It is worth noting, however, that the

only case cited for such a theory (*Mettes v. Quinn,* 89 Ill.App.3d 77, 44 Ill.Dec. 427, 411 N.E.2d 549 (3d Dist.1980)) is wholly inapposite. There Mettes was barred from bringing suit against her attorney for negligent legal advice that allegedly led to the discovery of a fraud that Mettes herself had perpetrated. Flanagan's current allegations do not similarly say that the negligence of Purdy and Partnership resulted in the discovery of a fraud by Flanagans. Instead Flanagan claims his attorney's negligence (or worse) led to the very event—the failure to obtain Board approval—that Rayman alleges to have constituted the fraud. Nothing in *Mettes* says that Flanagan, faced with potential liability for misleading Rayman (whether individually or through his agent Purdy), may not attempt to show that the misleading statements originated from his agent's irresponsibility and that ultimate liability should lie there rather than with Flanagan himself.